P. Jason Collins
jcollins@rctlegal.com
Jeremy H. Wells
jwells@rctlegal.com
Scotty G. Arbuckle III
tarbuckle@rctlegal.com
REID COLLINS & TSAI LLP
1301 S. Capital of Texas Hwy., Suite C-300
Austin, Texas 78746
T: (512) 647-6100
F: (512) 647-6129

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* INTEGRA MED ANALYTICS LLC, <br><br> Plaintiff, <br><br> v. <br><br> CREATIVE SOLUTIONS IN HEALTHCARE, INC., <br><br> Defendant. | Case No.: 17-CA-1249-XR <br><br> **FIRST AMENDED COMPLAINT** <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730** |

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................... 1

II.  JURISDICTION AND VENUE ................................................................................ 5

III. PARTIES ................................................................................................................... 5

IV. SUBSTANTIVE ALLEGATIONS .......................................................................... 6

   A.   Medicare and Medicaid Reimburse SNFs Based on Amount of Rehabilitation Services and the Patient's Length of Stay ..................................................................... 6

   B.   Creative Pushed a Culture of Non-Compliance that Encouraged Unnecessary Rehabilitation and Excessive Lengths of Stay ............................................................ 8

      1.   Creative Prescribed Ultra High Rehab Regardless of Need ......................... 10

      2.   Fraudulent billing of minutes at Creative Facilities .................................... 13

      3.   Maximizing Length of Stay and Profit to the Detriment of Patient Care .................................... 15

   C.   Relator's Methodologies ......................................................................................... 16

   D.   Defendant's False Claims ....................................................................................... 19

      1.   Creative Facilities' False Claims for Reimbursement.................................. 19

         A.   Creative Consistently Uses Higher Ultra High Rehab Across All 62 Principal Diagnosis Groups.................................................................................... 19

         B.   Creative's Excessive Use of Ultra High Rehab is Most Egregious Across 58 Principal Diagnosis Groups ............................................................................... 23

         C.   The Excessive Use of Ultra High Rehab is Systemic Across Creative Facilities and not Limited to a Few Facilities................................................................ 27

         D.   Examples of Specific False Claims Submitted by Creative .................................... 29

      2.   The Large Proportion of Patients Receiving I) Exactly 100 Days of Ultra High Rehab and II) Over 60 Days of Ultra High Rehab Demonstrate Creative's Attempts to Maximize Medicare Reimbursements................................................................................... 36

         A.   Creative Treats an Abnormally High Amount of Patients with Ultra High Rehab up Until Medicare Coverage Expires at 100 Days ................................. 36

         B.   The Spike in Patients Receiving Exactly 100 Days of Ultra High Rehab is Consistent Across Creative Facilities ................................................................ 38

         C.   Creative Maximized Revenue by Providing Ultra High Rehab to High Proportion of Patients for 60 or More Days.................................................................. 40

      3.   Alternative Hypotheses for Excessive Ultra High Rehab Do Not Stand and Confirm that Creative Fraudulently Billed Medicare ............................................................. 42

         A.   Patient Characteristics and Demographics do not Explain the Excessive Ultra High Rehab at Creative .......................................................................... 43

         B.   Creative's Acquisition of New Facilities Demonstrates that Creative Management Causes the Excessive Ultra High Rehab .......................................... 49

            i.   Bexar's Increase in Ultra High Rehab After its Acquisition by Creative Indicates that Ultra High Rehab is Caused by Creative's Practices ........................ 51

ii.   Mineral Wells' Increase in Ultra High Rehab After its Acquisition by Creative Indicates that Ultra High Rehab is Caused by Creative's Practices ........................................................... 54

iii.   Lubbock II's Increase in Ultra High Rehab After its Acquisition by Creative Indicates that Ultra High Rehab is Caused by Creative's Practices ........................................................... 56

iv.   The Effect Continues to be Striking when Analyzing the Cumulative Effect of the Acquisitions Across Creative SNFs ............................................................................................... 60

C.   Excessive Ultra High Rehab Cannot be Explained by Patients Diagnosis at the SNF ........... 63

D.   Attending Physicians are not Responsible for the Excessive Ultra High Rehab ................... 65

E.   Excessive Ultra High Rehab is not Explained by the Referring Hospital or the Attending Physician During Patients' Inpatient Hospital Stay ......................................................................... 69

F.   Summary of Determining What Caused the Excessive Ultra High Rehab ............................ 74

4.   Creative Keeps its Patients and Provides Skilled Nursing Services Longer than Necessary ...... 75

A.   Creative Consistently Provides an Excessive Length of Stay for Patients Across Principal Diagnosis Groups ............................................................................................................................. 75

B.   The Excessive Length of Stay is Systemic Across Creative Facilities and not Limited to a Few Facilities ..................................................................................................................................... 82

C.   Patient Characteristics and Demographics do not Explain the Excessive Length of Stay at Creative ............................................................................................................................................ 83

D.   Attending Physicians are not Responsible for the Excessive Length of Stay ........................ 86

5.   Economic Damages .................................................................................................................. 89

V.   CAUSE OF ACTION .................................................................................................................. 93

PRAYER FOR RELIEF ......................................................................................................... 94

VI.   JURY TRIAL DEMANDED ........................................................................................................ 94

This is an action brought by Plaintiff/Relator Integra Med Analytics LLC ("**Relator**") on behalf of the United States of America pursuant to the Federal False Claims Act, 31 U.S.C. § 3729, et seq. In support thereof, Relator alleges as follows:

## I.    INTRODUCTION

1.    Relator brings this action to recover more than $94.97 million paid by Medicare and Medicaid to a network of skilled nursing facilities ("**SNFs**") run by Creative Solutions in Healthcare, Inc. ("**Defendant**" or "**Creative**"). Relator conducted a multi-faceted investigation of Creative's business practices—which included interviewing former employees, reviewing training and marketing materials—which uncovered that Creative intentionally and systematically charged for excessive rehabilitation services as part of a systematic effort to boost its facilities' Medicare revenue. Relator's extensive econometric analysis reliably indicates that Creative carried out this scheme to great effect.

2.    Creative owns and operates a large network of SNFs throughout Texas.[1] Between 2012 and 2018, Creative received approximately $314 million in Medicare reimbursements for skilled nursing care, and it received an estimated $9 million more from Medicaid as coinsurance on Medicare SNF claims. Like all SNFs, Medicare compensated Creative according to the quantity of therapy provided to its patients, and Medicaid covered the required copayments for dual-enrolled patients. Thus, increasing the quantity of a patient's therapy leads to a higher per-diem reimbursement from Medicare, and excessive lengths of stay leads to higher copayments from Medicaid. Through its investigation, Relator has uncovered that Defendant fraudulently billed Medicare and Medicaid for unnecessary and unreasonable "Ultra High Rehab"—the most

---

[1] Creative has owned and operated 48 SNFs which are included in this complaint. Throughout this complaint, these 48 facilities are often referred to as the Creative facilities. A list of the 48 Creative SNFs at issue in this case is attached as Exhibit A. Relator has only included in the analysis of these SNFs the patient admissions during which Creative owned and operated each SNF.

intensive therapy provided by SNFs—and also kept patients in Ultra High Rehab longer than necessary.[2]

3.      Creative management routinely pressured its facilities to prescribe Ultra High Rehab—and to do so for longer periods of time—based on maximizing profits rather than patient needs. This internal pressure was so pronounced that Creative ranked its facilities by profit and shared the results with facility administrators on a regular basis. The pressure resulted in outrageous overuse of Ultra High Rehab, including to patients with no mental capacity to benefit from therapy and patients that were on the verge of death. Staff at Creative facilities even received pressure to administer therapy to patients that refused.

4.      Creative therapists were also trained to fraudulently bill for minutes to meet the minimum threshold for Ultra High Rehab. These efforts included: i) billing for therapy while patients were not engaged, ii) billing group therapy as individual therapy, iii) billing for non-skilled services, iv) billing evaluation sessions as therapy sessions, and v) falsifying therapy evaluations. Therapists at Creative facilities were also encouraged by management to "back date" patient evaluations, thus allowing for more minutes to bill toward rehab. Creative's excessive focus on profits at Creative resulted in a misallocation of resources toward providing unnecessary therapy services, resulting in high rates of unnecessary hospitalizations.

5.      Relator conducted an extensive econometric analysis demonstrating that these practices were pervasive and that there is no legitimate explanation for Creative's excessive use of Ultra High Rehab. Creative consistently provided excessive Ultra High Rehab to patients diagnosed with conditions across 58 principal diagnosis groups. The probability that this occurred due to random chance is less than 1 in 100 million. When analyzing individual Creative facilities,

---

[2] To be conservative, only the cases with excessive Ultra High Rehab have been identified herein as fraudulent, even though Creative's excessive billing stretched across every level of rehabilitation services.

each SNF billed such an excessive amount of Ultra High Rehab that the probability so many facilities are random outliers is also less than 1 in 100 million. In other words, consistent with extensive interviews of staff at many different Creative facilities, Creative's excessive use of Ultra High Rehab is a deliberate, system-wide practice, not the practice of a few rogue facilities.

6.    Relator's analysis uses causal econometric methods. These methods rule out alternative explanations and characteristics that could potentially explain the observed patterns and confirm that the observed excessive billing for Ultra High Rehab is the result of a centralized and concerted effort by Creative to fraudulently maximize Medicare and Medicaid revenue.

7.    **First**, Relator's analysis shows how Creative maximized revenue by treating a relatively high proportion of patient admissions with exactly 100 days of Ultra High Rehab—the maximum number of days that are reimbursable by Medicare for a patient's spell of illness. In other words, Creative intentionally provided unnecessary Ultra High Rehab up until the last day possible. Tellingly, consistent with Creative management directives to keep patients for the full 100 days covered under Medicare Part A, Creative administered Ultra High Rehab for ***exactly 100 days at 7.8 times the rate of other facilities***. Econometric methods show that the probability that this difference in proportion of patient admissions receiving exactly 100 days of Ultra High Rehab is random is less than 1 in 100 million.

8.    **Second**, Relator's fixed-effect regression model rules out the possibility that specific patient characteristics and symptoms justify Creative's excessive use of Ultra High Rehab. The regression allowed Relator to isolate the amount of additional Ultra High Rehab a patient received just by being admitted to Creative, after controlling for the patients' demographics and medical factors. This analysis further shows that Creative patients did not receive Ultra High Rehab because of medical need, but rather because of Creative's fraudulent therapy and billing

practices, consistent with therapist accounts of having pressure to provide unnecessary skilled therapy.

9.      **Third**, when Creative acquired SNFs between 2012 and 2015, Relator found statistically and economically significant increases in the amount of Ultra High Rehab provided to patients after the acquisitions occurred. The increase is highly significant even after controlling for potential changes in patient and demographic characteristics after the acquisition, which indicates that it is Creative that is responsible for the excessive Ultra High Rehab that was billed to Medicare.

10.     **Fourth**, Relator's analysis further uncovered that when the exact same physician had patients at both Creative and other facilities, the physician's Creative patients received significantly more intensive rehab. In other words, Creative—rather than doctors—drove its patients' unnecessary Ultra High Rehab. Moreover, the large statistical significance of this effect demonstrates that there was a system-wide and profit-maximizing directive by Creative to provide excessive rehab which is consistent interviews regarding the excessive focus on maximizing Ultra High Rehab by management across Creative facilities.

11.     In short, Relator has determined through its qualitative and quantitative investigation that Creative has and continues to engage in fraudulent billing to Medicare and Medicaid for both excessive and unnecessary Ultra High Rehab. Through its fraudulent practices, between 2012 and 2018, Creative submitted more than $94.97 million in false claims for Medicare reimbursement and additional false claims for reimbursement from Medicaid in an amount to be proven at trial.[3]

---

[3] Creative's false claims to Medicaid arise from coinsurance payments for Medicare patients that were dual enrolled in Medicaid. If Creative's Medicare patients were dual enrolled in Medicaid at a similar rate to county-level averages, Relator estimates that Creative submitted approximately $2.01 million in false claims to Medicaid.

## II.    JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

13.    This Court has personal jurisdiction over each named Defendant because, inter alia, Defendant transacted business in this District; resides in this District; engaged in wrongdoing in this District; and/or caused the submission of false or fraudulent claims in this District.

14.    Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c). During the relevant time period, a substantial portion of the events complained of that gave rise to Plaintiff's claims occurred in this District in violation of 31 U.S.C. § 3729 and § 3730. Further, 31 U.S.C. § 3732(a) provides for nationwide service of process.

15.    There has been no public disclosure of the allegations herein. To the extent that there has been a public disclosure unknown to Relator, Relator is an "original source" under 31 U.S.C. § 3730(e)(4). Relator has independent knowledge of the information on which the allegations are based, which materially adds to any publicly available information related to the allegations in this Amended Complaint. Furthermore, Relator has voluntarily provided the information on which these allegations are based to the Government before filing this *qui tam* action based on that information. *See* 31 U.S.C. § 3730(e)(4).

## III.    PARTIES

16.    Relator Integra Med Analytics LLC is a Texas limited liability company with its principal place of business in Austin, Texas.

17.    Relator is an associated company of Integra Research Group LLC, which specializes in using investigative, qualitative, and statistical analysis to uncover and prove fraud.

18.    Defendant Creative is a Texas corporation located at 4150 International Plaza, Suite 600, Fort Worth, Texas 76109-4831. Creative is authorized to conduct business in Texas, with its

registered agent listed as Robert C. Wiegand, 325 North St. Paul Street, Suite 3750, Dallas, Texas 75201.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Medicare and Medicaid Reimburse SNFs Based on Amount of Rehabilitation Services and Patients' Length of Stay

19.    SNFs are designed to provide skilled care, including nursing and rehabilitation services, following an inpatient hospital stay. To be eligible for Medicare benefits for SNFs, a beneficiary must have an inpatient hospital stay of at least three days. Medicare will cover up to 100 days of SNF care per illness and beginning on the 21st day of skilled nursing care, the beneficiary is responsible for a daily copayment of approximately $156.[4] This copayment may be covered by another form of insurance, including Medicaid.

20.    Medicare reimburses SNFs at a per-diem rate based on one of 66 resource utilization groups ("**RUGs**"), which is determined by the amount of therapy and other services provided to patients. The RUGs can further be simplified into a few categories based on the amount of rehab provided. The highest category, referred to as Ultra High Rehab, is for patients receiving more than 720 minutes of rehab in a week. The lowest category, referred to as Low Rehab, represents patients receiving between 45 and 149 minutes of rehab per week. There are also patients who receive less than 45 minutes of rehab per week, but receive other types of skilled nursing services, which Relator has categorized as No Rehab. The highest categories of rehab are reimbursed at a higher rate than the lower categories of rehab, with the categories being differentiated based only on the quantity of rehab provided per week. Within each therapy category, the payment can vary for individual RUGs based on a patient assessment and other

---

[4] *See, e.g.*, Medpac, *SNF Services Payment System* at 1 (Oct. 2015), *available at* https://goo.gl/n3FA1p.  The average daily coinsurance for SNFs from 2012 to 2018 was $156.43.

services provided. Relator's analysis focuses solely on the quantity of rehab provided.[5] These broad SNF RUG reimbursement categories are included in Table 1 below.

**Table 1. Broad SNF RUG categories.**
The following table shows the SNF categories based on the required weekly therapy amounts. Physical therapy, occupational therapy, and speech pathology all count towards the required therapy amounts.

| Category | Therapy Amount |
|---|---|
| Ultra High Rehab | 720+ minutes per week |
| Very High Rehab | 500 – 720 minutes per week |
| High Rehab | 325 – 499 minutes per week |
| Medium Rehab | 150 – 324 minutes per week |
| Low Rehab | 45 – 150 minutes per week |
| No Rehab | Less than 45 minutes per week |

21.    To receive Medicare coverage for skilled nursing services, the patient must be covered under Medicare Part A, have a qualifying inpatient hospital stay, and require skilled services to be provided for an ongoing condition treated during the hospital stay or a new condition acquired since the beneficiary started receiving skilled nursing care.[6] Additionally, the skilled services must be reasonable and necessary for the diagnosis or treatment of the condition.[7]

22.    A series of assessments are required to determine the reasonableness and necessity of skilled services provided, including the amount of rehab provided and consequently the resource utilization group and corresponding per-diem reimbursement amount. Daily assessments are conducted by staff at the SNF and these assessments must be periodically recorded and submitted to the Centers for Medicare & Medicaid Services ("**CMS**"). The initial assessment must be submitted to CMS within 8 days, and subsequent recorded assessments must be done on days 14, 30, 60, and 90.[8] Additional assessments are required when necessary to account for significant

---

[5] *See generally id.*

[6] *See* Centers for Medicare and Medicaid Services, *Medicare Coverage of Skilled Nursing Facility Care* at 17 (Jan. 2015), available at https://goo.gl/Ms63mQ.

[7] *Id.* at 18.

[8] *Id.* at 25.

changes in the patient's condition.[9] These assessments are typically coordinated by a registered nurse at the SNF, along with the participation of other healthcare professionals;[10] the patient's plan of care is ultimately determined by a doctor's orders and the results of these reported assessments.[11]

23.     By increasing the quantity of rehab provided, without otherwise changing any other care to a patient, an SNF can move the patient's claim to a higher RUG category and therefore get a higher per-diem payment amount. For example, in 2016 the RUGs in the category for Ultra High Rehab pay anywhere between $500 and $785 per day, depending on other patient characteristics and services provided. Care for patients in the lower category of Medium Rehab is reimbursed from $300 to $580 per day in 2016, depending on patient characteristics and services provided. Therefore, even just reclassifying patients from the Medium category to the Ultra High category would typically yield an extra $200 per day per patient.[12] Treating patients for Ultra High Rehab when the patient no longer requires any skilled nursing services would yield an additional $568 a day on average. Thus, systems like Creative have an economic incentive to push for more rehab treatment beyond what is considered medically reasonable or necessary.

**B.     Creative Pushed a Culture of Non-Compliance that Encouraged Unnecessary Rehabilitation and Excessive Lengths of Stay**

24.     Relator's multifaceted investigation of Creative facilities uncovered that Creative leadership deliberately strategized to increase Medicare revenue by maximizing the amount of therapy administered to its patients, regardless of patient need.

---

[9] *Id.*

[10] *See* Centers for Medicare and Medicaid Services, *Medicare-Required SNF PPS Assessments* (Oct. 2016), available at https://goo.gl/DtDK4e.

[11] *Id.*

[12] The SNF per-diem reimbursement amount is further adjusted based on the facility's location to reflect the additional cost incurred in some metropolitan areas. Relator has ignored those adjustments in order to focus on the marginal revenue that is attributed solely to its increased use of Ultra High Rehab. Accounting for these adjustments would only increase the marginal revenue Creative receives through its excessive billing of Ultra High Rehab.

25.     Creative's excessive rates of Ultra High Rehab are rooted in its leadership's drive to maximize profits at Creative facilities. Relator uncovered that Creative's profit-maximizing motives were so pronounced that it ranked its facilities by profit and shared the results with facility administrators on a regular basis. As further incentive for administrators to maximize Medicare revenue, Creative offered raises to facility administrators who increased Medicare revenue. To maximize Medicare revenue, Creative leadership specifically tracked and sought to increase their patients' Medicare RUG levels. According to a former Director at Hearne,[13] the facility administrator received a report at 9:00 AM every Tuesday with the facility's RUG rates that would then be sent to Creative management. Tracking RUG levels was a key part of the strategy to increase revenue, according to a former Director at Longview.

26.     To execute on its scheme to increase Medicare revenue by maximizing therapy, Creative collaborated with two rehab contractors, Century Rehab ("**Century**") and Reliant Rehabilitation ("**Reliant**"), whose business models are predicated on increasing revenue by billing more therapy minutes and increasing Medicare RUG levels. These companies were hired by Creative to provide training, management and staffing for therapy services, and played a key role in Creative's scheme. Creative found willing partners to enable it to maximize Medicare revenue through billing for high amounts of therapy. Indeed, according to the former Director at Crossroads Nursing and Rehabilitation, both Creative and Century leadership set goals to keep the RUG rates as high as possible. This singular focus on maximizing RUGs led to "compromising situations" for rehab staff. According to a former occupational therapist at Beaumont, Reliant and Century employees frequently departed because of the companies' unethical behavior.

---

[13] Creative facilities are referred to by their short name listed in Exhibit A.

### 1.    Creative Prescribed Ultra High Rehab Regardless of Need

27.    The combination of the profit-driven performance culture and goals for RUG levels at Creative meant that therapy was unnecessarily prescribed to maximize profits as opposed to being prescribed based on patient need. This was manifest in multiple ways: i) therapy prescribed based on patients' insurance (*i.e.*, Medicare Part A) instead of based on patient need, ii) therapy prescribed based on directives from the facilities' Director of Rehab instead of based on patient need, iii) pressure from rehab contractor's regional leadership to maximize RUGs, iv) pressure from administrators to maximize RUGs, v) provision of therapy to patients without the mental capacity to benefit from it, and vi) provision of therapy to patients who could not tolerate it.

28.    This excessive provision of Ultra High Rehab at Creative facilities without regard to patient need is in direct contradiction to Medicare reimbursement rules which state that SNF care is only covered if: "The services delivered are reasonable and necessary for the treatment of patient's illness or injury, *i.e.*, are consistent with the nature and severity of the individual's illness or injury, the individual's particular medical needs, and accepted standards of medical practice. The services must also be reasonable in terms of duration and quantity."[14] The rules also state that if this factor is not met, "a stay in a SNF, even though it might include the delivery of some skilled services, is not covered. For example, payment for a SNF level of care could not be made if a patient needs an intermittent rather than daily skilled service."[15]

29.    Creative facilities sought to maximize revenue by assigning therapy minutes to exhaust insurance coverage instead of based on patient need. According to a former occupational therapist at Brownwood II, if patients came into the facility, they were assigned rehabilitation minutes if they could tolerate any kind of therapy at all. In addition, according to this therapist, the

---

[14] Centers for Medicare and Medicaid Services, "Medicare Benefit Policy Manual", Rev. 249, November 2, 2018, Chapter 8 - Coverage of Extended Care (SNF) Services Under Hospital Insurance, *available at* https://goo.gl/Kvnz25.

[15] *ibid.*

facility's rehab manager would repeatedly instruct staff to put patients on Ultra High Rehab if Medicare would pay for it. A former staff member at Devine, added that therapists had to "put up a fight" to prevent a Medicare Part A participant from being put on Ultra High Rehab.

30.     Rehab directors at Creative facilities specifically pushed Ultra High Rehab without regard to patient need. Former occupational therapists at Brownwood II and Fairfield told Relator that management would get "pissed off" when patients were not assigned Ultra High Rehab. At Lubbock II, a former Physical Therapist recalled receiving pressure from the Director of Rehab to provide Ultra High Rehab without any attention to the patients' plan of care.

31.     At Creative facilities, the blanket assignment of Ultra High Rehab without regard to patient need by Directors of Rehab can in part be attributed to the fact that at least one of Creative's rehab contractors, Century Rehabilitation, often employed Directors of Rehab with no experience as therapists nor any clinical knowledge, including at Fairfield. At Beaumont, a former therapy assistant recalled to Relator that their director had only a GED, and technicians were unskilled with no clinical knowledge. As a result, the therapy assistant recalled circumstances where Ultra High Rehab was unethically assigned from management who did not have a grasp of patient needs. Through additional interviews and qualitative research, Relator further confirmed the pattern at Century Rehabilitation where Directors of Rehab—who supervised the team of rehab therapists at SNFs—were hired with no therapy background and thus not qualified to provide clinical oversight, particularly if pushing for excessive Ultra High Rehab. Directors of Rehab would be hired from unrelated industries, having been in previous backgrounds such middle school educator, and some had not even graduated from college.

32.     A key reason why Directors of Rehab at Creative facilities exerted pressure on their therapists to provide excessive Ultra High Rehab is that they themselves received pressure to maximize therapy from their regional managers. According to a former Director of Rehab

employed by Century Rehabilitation at a Creative facility, management would "come down" on staff if all patients weren't given Ultra High Rehab. This former director was ex-ante dictated therapy minutes to assign and then required to create any needed justification for the provision of Ultra High Rehab. Another former Century Director of Rehab at a Creative facility recalled having to send in a report every week to Century management that detailed RUG levels and required justification for every patient that was not receiving Ultra High Rehab. After receiving the report, Century management would follow-up if patients were not receiving Ultra High Rehab.

33.     The pressure to provide unnecessary therapy came not only from management of Creative's rehab contractors but also from Creative's own administrators. According to a former Physical Therapist at Fairfield, there was a patient with a mental disorder who was physically fully capable, would not respond to therapy, and did not require therapy. However, upon explaining this to a Creative administrator, the administrator insisted that the patient be put on at least two weeks of therapy. A former therapy assistant who worked at both Memphis and Wellington recalled that the Creative administration kept tight control over its facilities' patients, and even when patients were "running down the halls" and ready to be discharged, Creative management regularly insisted on keeping them for two more weeks.

34.     Particularly problematic was Creative's provision of excessive Ultra High Rehab to patients with mental disorders who did not have the mental capacity to benefit from it. For instance, at Fairfield, Creative management pushed high therapy levels to patients in the lock-down unit who typically suffered from cognitive disorders such as dementia and Alzheimer's. Another former staff member at Fairfield encountered similar issues where patients in the lock-down unit were receiving unnecessary therapy, including schizophrenic people with severe cognitive disorders, patients who couldn't talk or interact with therapists, and other patients that

saw no benefit from therapy. The staff member found such therapy akin to "babysitting" from which patients derived no benefit.

35.     The pressure from Creative to provide excessive Ultra High Rehab resulted in actual harm to patients. At Lubbock II, a former Physical Therapist recalled receiving pressure from the Director of Rehab to treat patients that simply couldn't tolerate the treatment. Similarly, at Fairfield, therapy was forced on patients who refused therapy. Despite protestations from the therapist, management would say, "just keep trying." The Fairfield therapist recalled a 98-year-old with a bowel obstruction and in constant pain who was given therapy 45 minutes a day. The patient wanted nothing more than to be left alone, but management insisted that treatment continue. According to a former nurse at Lufkin, Creative encouraged therapy to patients up to the day they died. Similarly, a former physical therapist at Brownwood II received pressure to provide therapy to patients on their death bed in order to maintain Ultra High Rehab levels. One of Creative's rehab contractors, Century Rehabilitation even trained therapists on how to continue treating patients that refused therapy.

### 2.     Fraudulent billing of minutes at Creative Facilities

36.     At Creative, therapists not only received pressure to improperly assign Ultra High Rehab, but also were trained to fraudulently bill for minutes to meet the minimum threshold for Ultra High Rehab. This was manifest in multiple ways including: i) billing for therapy while patients were not engaged, ii) billing group therapy as individual therapy, iii) billing for non-skilled services, iv) billing evaluation sessions as therapy sessions, and v) falsifying therapy evaluations.

37.     Therapists at Creative facilities were encouraged to bill for therapy even if patients were not engaged and thereby would not benefit from it. According to a former occupational therapist at Brownwood II, management figured out ways to make Ultra High Rehab work for every patient, even if they were unconscious or suffering from dementia.

38.     Also common at Creative facilities was group therapy being billed as individual treatment. At Brownwood II, management would allow therapists to bill group therapy as individual treatment; in doing so therapists were able to reach productivity rates as high as 120%. Similarly, at Devine, a former therapy assistant recalled being advised to "double up" patients in order to hit high productivity targets.

39.     Furthermore, management at Creative facilities either encouraged or knowingly allowed therapists to bill for non-skilled services. At Brownwood II, for instance, a former occupational therapist observed their rehab manager providing electronic stimulation to a patient while doing her notes. At another Creative facility, a former Director of Rehab got in trouble for reporting to Century management that one of the therapists was billing for both unskilled therapy and more therapy than was actually provided.

40.     In order to increase minutes, management also led therapists to fraudulently bill for therapy minutes during the evaluation session. A former physical therapist at Fairfield recalled being instructed to only allot 15 minutes for evaluation, even though it required 45 minutes, with the rest of the evaluation session charged at therapy rates.

41.     Therapists employed by both Century and Reliant at Creative facilities were incentivized to fraudulently bill for therapy minutes because of unreasonably high targets for productivity, measured as billable therapy time as a percent of total hours. A former occupational therapist at Brownwood II recalled almost 100% productivity by therapists, with every minute of time expected to be billed, including progress notes, meetings, and many other daily tasks other than patient care. The productivity expectations were similarly high at Fairfield, as recalled by a former therapy assistant, who recalled having to maintain 95% productivity.

42.     Another strategy employed at Creative to increase RUG levels was to falsify therapy evaluations. A former occupational therapist at Brownwood II recalled being asked in

March 2012 to be "unethical" by fabricating evaluations to justify the past provision of therapy since there were patients getting therapy who had not received the necessary evaluation by a licensed therapist. According to this therapist, they were expected to back-date the evaluations to allow more time to be billed. When the therapist declined to do so, management brought in another therapist that would.

### 3. Maximizing Length of Stay and Profit to the Detriment of Patient Care

43.     Creative facilities sought to maximize the length of stay to the full 100 days covered by Medicare Part A. According to a former administrator at a Creative facility, Creative corporate management would provide goals for nursing and therapy, and as a result, facilities would seek to maximize Medicare Part A reimbursement by keeping patients for the full 100 days, even if it was not clinically appropriate. Similarly, a former nurse at Amarillo VI, recalls how staff would not discharge able Medicare Part A patients since skilled Medicare Part A residents were more profitable than long-term residents. One tactic used at Amarillo VI to extend the stay of Medicare Part A patients would be to get orders for a physical or occupational therapist to renew the therapy treatment and keep patients in the facility.

44.     Therapy staff at Creative facilities also received goals to keep patients for the full 100 days covered by Medicare Part A. A former physical therapist at Lubbock II recalled that it was very common for there to be goals for patients to stay for 100 days in order to "drain" their Medicare Part A benefits. Similarly, at Devine, a therapy assistant recalled receiving orders to exhaust Medicare Part A reimbursement by providing therapy for the full 100 days even when it was not warranted. As such, this therapy assistant was asked to be "creative" in order find things to do, such as going over education, assisting with toileting, and other non-therapy tasks that certified nurse assistant could perform. This conduct, promoted by therapy management at

Creative, is in direct contraction to Medicare reimbursement rules, which state that "routine" non-skilled services are not reimbursable.

45.     Finally, the excessive focus on profits at Creative resulted in a misallocation of resources towards providing unnecessary therapy services. This misallocation resulted in a lack of sufficient services toward patient care.

46.     Creative nurses often complained about insufficient staffing, insufficient provision of care. According to a former nurse at Vidor, the case load per nurse was overwhelming—often so high that the level of care was inadequate. At Amarillo VI, a former nurse recalls high rates of error due to nurses being overtasked since the facility was always short staffed and did not hire the proper staff. Furthermore, a former Director of Nursing at a Creative facility recalls the for-profit driven culture at Creative resulting in very high staffing ratios thus creating an unsafe environment.

47.     As a result of this lack of basic care, patients at Creative facilities have a higher rate of potentially avoidable hospitalizations, such as skin ulcers (150% higher), dehydration (86% higher), falls and trauma (70% higher) and UTI (45% higher). On average, Relator found that Creative patients are over 20% more likely to acquire a Potentially Avoidable Hospitalization than at other skilled nursing facilities.

### C.     Relator's Methodologies

48.     In addition to interviewing numerous former employees of Creative, Relator uncovered both the existence and the magnitude of the fraudulent billing that Creative was engaged in through Relator's quantitative and statistical analysis. Indeed, Relator found that Creative's unnecessary provision of Ultra High Rehab was systemic across a large number of patients and across its 48 facilities. To detect the patterns of fraud at Creative, Relator employed unique

algorithms and statistical processes to analyze SNF Medicare claims data obtained from CMS.[16] These proprietary methods have allowed Relator to identify with specificity the false claims made by the Defendant to fraudulently inflate revenue on Medicare claims. Relator's analysis focused on identifying excessive amounts of Ultra High Rehab beyond what would be considered reasonable or beneficial to patients given a particular illness, including instances where the patients no longer required any skilled nursing care.

49.     To identify truly egregious patterns of excessive Ultra High Rehab, Relator employed a methodology that accounts for patient medical characteristics in determining the necessity of rehab. Specifically, Relator compared the rate of Ultra High therapy provided at Creative to the rate of Ultra High therapy provided at other SNFs for patients with comparable principal diagnosis codes at their prior inpatient hospital stay. This benchmarking process is consistent with Medicare guidelines requiring that skilled nursing services be reasonable and necessary for the treatment of the specific medical condition.[17]

50.     To conduct its analysis, Relator formed 589 groupings (or "**bins**") of similar principal diagnosis codes, of which 62 were relevant to Creative's claims.[18] Within each of the bins Relator compared the average days of Ultra High Rehab at Creative to the average days of Ultra High Rehab billed at all other SNFs receiving Medicare reimbursements as a benchmark. While Relator's precise benchmarking of medical billing is unique, experts have developed and applied similar benchmarks in financial return literature.[19] Benchmarking has the advantage of

---

[16] Only claims for patients admitted on or after January 1, 2012, and prior to April 1, 2018, were analyzed by the Relator to allow for analysis of the patient's entire length of stay. Relator also analyzed the associated inpatient hospital claims data from CMS for the SNF patients.

[17] See Centers for Medicare and Medicaid Services, Medicare Coverage of Skilled Nursing Facility Care at 18 (Jan. 2015), available at https://goo.gl/Ms63mQ.

[18] Relator included in the analysis any principal diagnosis categories that were used at least 100 times by Creative.

[19] See the widely-used methodology developed by Kent Daniel, Mark Grinblatt, Sheridan Titman, Russ Wermers, *Measuring Mutual Fund Performance with Characteristic-Based Benchmarks*, The Journal of Finance, vol. 52(3) at 1035–1058 (1997). This methodology is first applied to measuring hedge-fund performance by John M. Griffin

allowing for very specific and comparative groupings. This avoids imposing specific linearity on the data, which in turn gives Relator's methodology more statistical power and precision.

51.     Given that some natural variation in days of Ultra High Rehab among SNFs is expected, Relator used two filters to further ensure that it identified truly extremely abnormal usage. First, bins were only included where Creative's days of Ultra High Rehab were either ***more than twice the national rate*** or were ***five days longer than at other facilities***. Second, Relator validated the results of its analysis by determining the statistical significance of each pattern used by Creative.[20] Relator only flagged claim groupings where there was less than a ***1 in 1,000 chance*** of Relator's findings being due to chance.

52.     For example, Creative has many patients that were diagnosed with "Unspecified Septicemia"[21] during their preceding inpatient hospital stay. Relator has found that, of Creative's 1,667 patients with "Unspecified Septicemia", the average patient received 23.44 days of Ultra High Rehab per admission. However, for the more than 900,000 patients admitted with "Unspecified Septicemia" at the nation's other SNFs, the average patient only received 13.14 days of Ultra High Rehab. In other words, Creative's patients received twice as much Ultra High Rehab at an average cost of $569 per day.

53.     To control for other explanations for the additional therapy billed at Creative, Relator employs a fixed effect linear regression model with additional controls for patient characteristics. Regression analysis is well-established and has been used to pinpoint actors behind misreporting in financial and economic contexts.[22] The fixed effect linear regression analysis thus

---

and Jin Xu, *How Smart Are the Smart Guys? A Unique View from Hedge Fund Stock Holdings*, Review of Financial Studies, Vol. 22.7 at 2531–2570 (2009).

[20] Relator's statistical significance is calculated by comparing the mean days of Ultra High Rehab at Creative versus other facilities.

[21] Unspecified Septicemia includes ICD-9 diagnosis codes 0388, 0389, 449, 77181, 7907, 99591, and 99592.

[22] Tomasz Piskorski, Amit Seru, and James Witkin, *Asset Quality Misrepresentation by Financial Intermediaries: Evidence from the RMBS Market*, The Journal of Finance, Vol. 70.6 at 2635–2678 (2015); Griffin, John M., and

examines if Creative gave Ultra High Rehab beyond what could be explained by diagnosis and patient characteristics. Through the regression, Relator isolated the amount of additional Ultra High Rehab a patient received just because of Creative characteristics, since it controls for a variety of patient characteristics including age, gender, and race, as well as county demographic factors such as the unemployment rate, log median income, and urban-rural differences. Patient heath characteristics and severity of illness are controlled by variables including the principal and secondary diagnosis codes of the patient's prior inpatient hospital visit, the existence of surgery, and the inpatient claim length of stay.  This analysis again shows that the Ultra High Rehab being offered at Creative is well outside acceptable norms, even after accounting for patient need.

54.     Additional analyses performed by Relator rule out alternative explanations for why Creative had an excessive amount of Ultra High Rehab. Relator ruled out that the excessive Ultra High Rehab was caused by the attending physician at the SNF or the attending physician during the patient's inpatient hospital stay. Indeed, physicians treating both Creative patients and patients at other facilities had a much lower level of rehab at other facilities, indicating that it is Creative rather than doctors driving Ultra High rehab treatment. After considering these factors, Relator shows that the cause of the excessive Ultra High Rehab can be attributed to Creative directly.

**D.     Defendant's False Claims**

**1.     Creative Facilities' False Claims for Reimbursement**

**A.  Creative Consistently Uses Higher Ultra High Rehab Across All 62 Principal Diagnosis Groups**

55.     Creative facilities fraudulently and consistently billed for excessive rates of Ultra High Rehab. To establish this finding, Relator assesses patients' medical need for rehab by categorizing patient admissions according to specific medical bins that are grouped by the principal

---

Gonzalo Maturana, *Who Facilitated Misreporting in Securitized Loans?*, Review of Financial Studies, Vol. 29.2 at 384–419 (2016).

diagnosis during the hospital stay prior to their admission to an SNF. These bins comprise all principal diagnosis groups with at least 100 admissions at Creative, and total 62. Within each bin of admissions with the same preceding inpatient principal diagnosis, Relator compared Creative's rate of Ultra High Rehab to the rate of Ultra High Rehab at other facilities. For example, nationwide, the average patient admitted with "Pneumonia; Organism Unspecified" will end up receiving approximately 13 days of Ultra High Rehab, whereas the average patient admitted with "Fracture of Neck of Femur (hip)" will end up receiving approximately 22 days of Ultra High Rehab. Relator's method accounts for the expectation that certain diagnoses might require greater amounts of Ultra High Rehab on average.

56.     The bin-based comparison of the rate of Ultra High Rehab at Creative versus at other facilities demonstrates Creative's systematic effort to excessively bill Medicare for Ultra High Rehab. Relator's statistical analysis is consistent with its interviews of former employees at Creative facilities, including a therapist who recalls that it was common practice to always place patients on the highest RUG level possible and then to maintain that level as much as possible. This therapist further stated that many patients are not capable of receiving the treatment or sometimes do not even have the mental capacity to do so but they were still encouraged to keep up the minutes. The statistical evidence supports this therapist's recollection as well as that of many other therapists interviewed, that there was pressure to place patients at Ultra High Rehab regardless of any patient's need.

57.     Panel A of Figure 1 shows rates of Ultra High Rehab at Creative on the x-axis (horizontal) and the rates of Ultra High Rehab at all other SNFs on the y-axis (vertical). Each dot in Panel A represents a principal diagnosis code group (bin) that Creative patients had at their prior inpatient hospital stay. The size of the dots is proportional to the number of admissions at Creative, so that larger dots represent proportionally more admissions. If the rates of Ultra High Rehab at

20

Creative for each diagnosis code were similar to the rates at other SNFs, then the dots would cluster on the 45-degree line. In Panel A, the red dots to the right of the 45-degree line show that Creative had higher rates of Ultra High Rehab for patients in ***every single one of the 62 inpatient principal diagnosis groups***. The graph demonstrates that Creative's use of Ultra High Rehab is not due to having sicker patients, but rather is widespread even after controlling for patient's hospital diagnosis prior to admission to an SNF.

58.     Panel B of Figure 1 shows the distribution of the number of days of Ultra High Rehab administered to patients for all principal diagnosis codes, with Creative in red and other facilities in blue. For other facilities, the number of days of Ultra High Rehab peaks at day 13.71, indicating that most patients at other facilities receive on average 13.71 days of rehab and very few receive more than 25. However, for Creative, the distribution is shifted significantly to the right, peaking at 24.89 days of Ultra High Rehab. This also shows that Creative has many more days of Ultra High Rehab across the principal diagnosis categories spectrum when compared to patients with the same principal diagnosis categories at non-Creative facilities.

59.     Thus, Creative does not specialize in providing Ultra Rehab to particular types of patients with particular illnesses, but instead bills for excessive Ultra High Rehab indiscriminately across all of the patient diagnoses it sees. The probability that random chance accounts for Creative's higher days of Ultra High Rehab relative to other facilities for all 62 inpatient diagnosis groups is less than 1 in 100 million, strongly indicating the amount of rehab provided was not anywhere close to the norms of medical practice.

**Figure 1. Average Days of Ultra High Rehab Based on Inpatient Principal Diagnosis for Creative Versus Other Facilities.**
Panel A shows, for 62 inpatient principal diagnoses (each represented by a dot), the average Ultra High Rehab treatment length for patients thus diagnosed at Creative versus at non-Creative facilities. We include only diagnoses where at least 100 patients were thus diagnosed at Creative. Panel B shows the distribution of average days of Ultra High Rehab at Creative versus at non-Creative facilities for each of the principal diagnosis groups.

*Panel A: Scatterplot of Average Ultra High Rehab by Inpatient Principal Diagnosis*



*Panel B: Distribution of Average Days of Ultra High Rehab by Principal Diagnosis*



## B. Creative's Excessive Use of Ultra High Rehab is Most Egregious Across 58 Principal Diagnosis Groups

60.    Although Creative uses higher amounts of Ultra High Rehab ***across all 62 inpatient principal diagnosis codes***, Relator applied two filters to further ensure that it identified truly extremely abnormal usage of Ultra High Rehab. First, Relator considered diagnosis groups in which Creative's days of Ultra High Rehab were either more than twice the rate at non-Creative SNFs or were five days longer than at other facilities. Second, Relator only flagged principal diagnosis groupings where the excessive Ultra High Rehab was statistically significant at the 99.9% confidence level, meaning there is less than a 1 in 1,000 chance Relator's findings being due to random chance. By adding these requirements, Relator restricted its analysis to only the most egregious cases of excessive Ultra High Rehab. Relator determined that 58 of the 62 inpatient principal diagnosis bins included fraudulent Ultra High Rehab, and all subsequent analysis is based on the patients who were admitted with one of those 58 inpatient principal diagnosis codes.

23

61.     Figure 2 below shows the top 20 inpatient diagnoses for patients who receive skilled nursing services at Creative. The amount of days at Ultra High Rehab for Creative is the red bar and the amount of days of Ultra High Rehab for all other SNFs are the blue bars. The graph shows that Creative uses Ultra High Rehab across *all 20* most common principal diagnosis categories at a much greater rate than other SNFs.

**Figure 2. Rate of Ultra High Rehab for admissions with the 20 most common inpatient principal diagnosis categories.**

The following figure shows the twenty most prevalent inpatient diagnosis codes and compares the average days of Ultra High Rehab at Creative versus other facilities. The diagnosis codes are ordered by the frequency with which they occur at Creative, from most common to least common. For example, Unspecified Septicemia is the most common principal diagnosis code from the inpatient stay, occurring in more than 1,667 admissions at Creative.



62.     To illustrate Creative's excessive Ultra High Rehab, Creative had 172 patients diagnosed with "E. Coli Septicemia" during their inpatient hospital stay prior to admission. These patients on average received 29.16 days of Ultra High Rehab at Creative. However, patients at other SNFs who were diagnosed with "E. Coli Septicemia" only received 13.91 days of Ultra High Rehab on average.

24

63.     Table 2 provides a detailed comparison of the rate of Ultra High Rehab across all of the 58 principal diagnosis codes, and demonstrates again how Creative provides significantly more Ultra High Rehab than do other SNFs. The difference between Ultra High Rehab usage at Creative and at the other facilities within each principal diagnosis grouping is extremely statistically significant, such that the probability that each of these differences could be due to random chance is less than one in 100 million for most principal diagnosis groupings.[23]

**Table 2. Ultra High Rehab by Principal Diagnosis Code Group.**

| Principal Diagnosis Group | # Admissions Creative | Avg. Days of Ultra High at Creative | Avg. Days of Ultra High at Other Facilities | Creative Rate Relative to Others | Statistical Significance[24] |
|---|---|---|---|---|---|
| Unspecified Septicemia | 1,667 | 23.44 | 13.14 | 178% | < 1 in 100 million |
| Fracture of Neck of Femur (hip) | 1,278 | 36.55 | 21.8 | 168% | < 1 in 100 million |
| Other Diseases of the Digestive System | 1,208 | 24.93 | 13.24 | 188% | < 1 in 100 million |
| Other Diseases of the Circulatory System | 860 | 26.19 | 14.37 | 182% | < 1 in 100 million |
| Pneumonia; Organism Unspecified | 859 | 27.6 | 13.31 | 207% | < 1 in 100 million |
| Other Injury and Poisoning | 858 | 29.66 | 17.34 | 171% | < 1 in 100 million |
| Urinary Tract Infection; Site Not Specified | 845 | 30.56 | 16.16 | 189% | < 1 in 100 million |
| Acute Renal Failure | 759 | 26.5 | 15.03 | 176% | < 1 in 100 million |
| Rehabilitation Care; Fitting of Prostheses; and Adjustment of Devices | 652 | 35.4 | 27.01 | 131% | < 1 in 100 million |
| Congestive Heart Failure; Nonhypertensive | 600 | 25.09 | 13.04 | 192% | < 1 in 100 million |
| Respiratory Failure | 567 | 23.53 | 13.53 | 174% | < 1 in 100 million |
| Occlusion of Cerebral Arteries | 563 | 32.98 | 22.6 | 146% | < 1 in 100 million |
| Obstructive Chronic Bronchitis | 512 | 24.14 | 12.93 | 187% | < 1 in 100 million |
| Other Endocrine; Nutritional; and Metabolic Diseases and Immunity Disorders | 473 | 23.02 | 14.27 | 161% | < 1 in 100 million |
| Delirium Dementia and Amnestic and Other Cognitive Disorders | 463 | 27.28 | 15.83 | 172% | < 1 in 100 million |
| Other Neoplasms | 384 | 17.86 | 10.54 | 169% | < 1 in 100 million |
| Osteoarthritis; Localized | 376 | 22.3 | 12.66 | 176% | < 1 in 100 million |
| Other Diseases of the Musculoskeletal System and Connective Tissue | 367 | 23.54 | 14.95 | 157% | < 1 in 100 million |
| Acute Myocardial Infarction | 364 | 23.29 | 13.31 | 175% | < 1 in 100 million |

[23] The probability is even considerably smaller in many cases, often less than 1 in 1 trillion, but we use this as a cutoff since the value is already incredibly small. All tests are under the two-sample z-test to compare the average days of Ultra High Rehab at other facilities to Creative's average days of Ultra High Rehab. This test relies on a standard normal distribution.

[24] The statistical significance of these represents the probability that the difference between the average days of Ultra High Rehab at other facilities is due to random occurrences.

| Principal Diagnosis Group | # Admissions Creative | Avg. Days of Ultra High at Creative | Avg. Days of Ultra High at Other Facilities | Creative Rate Relative to Others | Statistical Significance[24] |
|---|---|---|---|---|---|
| Other Diseases of the Respiratory System | 347 | 24.61 | 13.83 | 178% | < 1 in 100 million |
| Hypertensive Heart and/or Renal Disease | 326 | 23.71 | 13.54 | 175% | < 1 in 100 million |
| Aspiration Pneumonitis; Food/vomitus | 300 | 24.59 | 13.84 | 178% | < 1 in 100 million |
| Other Diseases of the Nervous System and Sense Organs | 297 | 29.15 | 18.51 | 157% | < 1 in 100 million |
| Atrial Fibrillation | 272 | 23.04 | 14.29 | 161% | < 1 in 100 million |
| Infection and Inflammation--internal Prosthetic Device; Implant; and Graft | 264 | 22.85 | 12.75 | 179% | < 1 in 100 million |
| Other Diseases of the Genitourinary System | 262 | 28.94 | 13.99 | 207% | < 1 in 100 million |
| Other Symptoms; Signs; and Ill-defined Conditions and Factors Influencing Health Status | 251 | 26.7 | 16.36 | 163% | < 1 in 100 million |
| Other Infectious and Parasitic Diseases | 248 | 21.24 | 13.12 | 162% | < 1 in 379 thousand |
| Other Diseases of the Blood and Blood-forming Organs | 240 | 21.19 | 13.18 | 161% | < 1 in 8 million |
| Diabetes with Other Manifestations | 221 | 26.35 | 14.71 | 179% | < 1 in 100 million |
| Other Central Nervous System Disorders | 220 | 26.15 | 16.31 | 160% | < 1 in 4 million |
| Cellulitis and Abscess of Leg | 210 | 26.55 | 15.67 | 169% | < 1 in 10 million |
| Other Mental Illness | 210 | 24.87 | 14.67 | 170% | < 1 in 2 million |
| Depressive Disorders | 193 | 32.7 | 18.11 | 181% | < 1 in 100 million |
| E. Coli Septicemia | 172 | 29.16 | 13.91 | 210% | < 1 in 100 million |
| Hypovolemia | 172 | 30.27 | 16.44 | 184% | < 1 in 100 million |
| Fracture of Vertebral Column without Mention of Spinal Cord Injury | 171 | 33.16 | 18.89 | 176% | < 1 in 100 million |
| Other Fracture of Lower Limb | 169 | 35.07 | 21.98 | 160% | < 1 in 8 million |
| Congestive Heart Failure | 168 | 19.7 | 12.52 | 157% | < 1 in 2 thousand |
| Other Intracranial Injury | 162 | 27.22 | 18.58 | 146% | < 1 in 7 thousand |
| Other Diseases of the Skin and Subcutaneous Tissue | 155 | 29.58 | 13.8 | 214% | < 1 in 100 million |
| Hyposmolality | 150 | 25.87 | 15.72 | 165% | < 1 in 73 thousand |
| Malfunction of Device; Implant; and Graft | 148 | 24.22 | 15.49 | 156% | < 1 in 26 thousand |
| Schizophrenia and Other Psychotic Disorders | 147 | 25.35 | 15.81 | 160% | < 1 in 9 thousand |
| Other Bacterial Pneumonia | 142 | 26.82 | 12.16 | 221% | < 1 in 19 million |
| Intestinal Infection | 142 | 27.26 | 13.57 | 201% | < 1 in 27 million |
| Hemorrhage of Gastrointestinal Tract | 139 | 23.14 | 13.26 | 174% | < 1 in 33 thousand |
| Other Connective Tissue Disease | 136 | 32.75 | 18.67 | 175% | < 1 in 5 million |
| Infective Arthritis and Osteomyelitis (except That Caused by Tb or Std) | 134 | 21.37 | 13.38 | 160% | < 1 in 3 thousand |
| Postoperative Infection | 133 | 21.1 | 13.49 | 156% | < 1 in 3 thousand |
| Other Venous Embolism and Thrombosis | 117 | 28.46 | 15.58 | 183% | < 1 in 554 thousand |
| Epilepsy | 112 | 28.84 | 16.37 | 176% | < 1 in 122 thousand |
| Pathological Fracture | 110 | 29.46 | 17.38 | 170% | < 1 in 37 thousand |
| Fracture of Humerus | 108 | 34.53 | 22.52 | 153% | < 1 in 4 thousand |

| Principal Diagnosis Group | # Admissions Creative | Avg. Days of Ultra High at Creative | Avg. Days of Ultra High at Other Facilities | Creative Rate Relative to Others | Statistical Significance[24] |
|---|---|---|---|---|---|
| Other Aftercare | 106 | 33.63 | 21.37 | 157% | < 1 in 56 thousand |
| Coronary Atherosclerosis | 106 | 24.08 | 12.1 | 199% | < 1 in 953 thousand |
| Intracranial Hemorrhage | 101 | 33.51 | 21.69 | 155% | < 1 in 4 thousand |
| Transient Cerebral Ischemia | 100 | 29.81 | 18.64 | 160% | < 1 in 20 thousand |

### C.  The Excessive Use of Ultra High Rehab is Systemic Across Creative Facilities and not Limited to a Few Facilities

64.    To rule out that excessive billing of Ultra High Rehab is unique to a few Creative facilities, Relator analyzed these trends for individual Creative facilities and compared them to other individual SNFs. Figure 3 shows the average length of Ultra High Rehab provided to patients at all facilities in the United States with at least 100 patient admissions and is ordered from facilities with the least Ultra High Rehab to facilities with the most. The trend of excessive Ultra High Rehab is prevalent across Creative facilities. All 47 Creative facilities with at least 100 claims are in at least the 71th percentile of all facilities based on average days of Ultra High Rehab. Out of more than 14,000 facilities with at least 100 Medicare admissions, Creative has 29 facilities in the top 1,000 facilities. It is difficult to overstate how mathematically impossible it would be for this scenario to exist due to random chance. The probability of Creative randomly having 29 out of 47 facilities (with at least 100 admissions) in the top 1,000 is less than 1 in 100 million.[25] Thus the behavior cannot be attributed to a few rogue facilities, but is instead systemic throughout the Creative system.

---

[25] This statistical probability is based on the uniform distribution. In this case, since there are more than 14,000 SNFs, the top 1,000 facilities would be equivalent to the top 7% of facilities. Hence, we should only expect that 7% of Creative's 47 facilities, or only 3 of its facilities, should be among the top 1,000 facilities, as opposed to 29 facilities.

**Figure 3. Distribution of average Ultra High Rehab treatment length by SNF.**
The following figure shows, for every SNF that had at least 100 admissions, the average number of Ultra High Rehab treatment days across all admissions in that facility. Creative facilities are highlighted in red. This graph comprises more than 14,000 SNFs.



65.    At bottom, Creative as a system treats patients with nearly double the days of Ultra High Rehab than other systems. The average Medicare patient admission at Creative facilities receives 27 days of Ultra High Rehab, whereas the average Medicare patient admission at other facilities receives 15.46 days of Ultra High Rehab. As shown in Figure 4, this difference is consistent across multiple years and is statistically significant as the probability that such a significant difference exists randomly is less than 1 in 100 million. Observing such extreme patterns consistent across the Creative facilities would require a coordinated effort from Creative management, which is consistent with Relator's interviews of former employees who worked at Creative facilities. Former therapists have reported to Relator that the pressure to provide unnecessary therapy came from Creative's administration. When recalling a patient with a mental disorder who was physically fully capable, did not respond to therapy, and did not require therapy, one therapist stated that a Creative Administrator insisted the patient be put on at least two weeks

28

of therapy. This former therapist continued by stating that she was constantly being pressured with minutes.

**Figure 4. Ultra High Rehab Treatment at Creative Versus Other Facilities.**
This figure shows the average days of Ultra High Rehab at Creative versus other facilities from year to year for both Creative (red) and other facilities (blue), showing that patients get more Ultra High Rehab at Creative. This is based on more than 20,000 patient admissions at Creative facilities and more than 13 million patient admissions at other SNFs.



■Creative ■Non-Creative Facilities

## D.  Examples of Specific False Claims Submitted by Creative

66.     Across all of the 58 diagnosis groups, Relator has identified numerous specific false claims submitted by Creative to Medicare. Each of these examples are claims in which Creative billed for medically unreasonable and unnecessary rehab. Such instances are consistent with Creative's pressure to provide excessive Ultra High Rehab, even at the expense of the quality of care its patients receive. Former therapists interviewed by the Relator told their own stories about being required to provide rehab to patients who were in pain from the rehab and or who were not benefiting at all from additional rehab. A former nurse at Creative recalls that therapy was provided to dying patients who were not expected to recover. As such, Relator has identified several claims

29

in which Creative provided patients with significant quantities of rehab up until the patient died. As a reminder, to qualify for Ultra High Rehab, a patient must receive at least 12 hours of therapy a week, and the patient must also receive one type of therapy (physical, occupational, or speech pathology) for at least 5 days, and second type of therapy for at least 3 days.[26]

67. █████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
█████████████████████████████████████████

68. █████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████

69. █████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

---

[26] *See* CMS Long-Term Resident Care Assessment Instrument 3.0 User's Manual, Version 1.14 (October 2016), retrieved from https://downloads.cms.gov/files/MDS-30-RAI-Manual-V114-October-2016.pdf.

[27] ████████████████████████████████████████████████████████████
████████████████████

[28] ████████████████████████████████████████████████████████████
███████████████████████



70. ██████████████████████████████████████████

72.     To further demonstrate Creative's billing of unreasonable and unnecessary rehab, the following table includes 50 additional examples of claims for SNF admissions submitted by Creative with excessive Ultra High Rehab, along with the excess days of Ultra High Rehab provided by Creative and the amount of additional revenue Creative received as a result.



**Table 3. Ultra High Rehab False Claims Made by Creative.**

| Beneficiary ID | Claim IDs | SNF | Admission Date | Age/ Gender/ Race | Inpatient Principal Diagnosis | Days of Ultra High Rehab | Days of Excess Ultra High Rehab | False Claim Amount |
|---|---|---|---|---|---|---|---|---|
| ██████ | ████ | █████ | █████ | ███ | ████ | █ | ███ | ████ |
| ████ | ██ | ████ | ████ | ██ | ██ | █ | ███ | ███ |
| ████ | ██ | ████ | ████ | ██ | ███ | █ | ███ | ███ |
| ████ | ██ | ████ | ████ | ██ | ██ | █ | ███ | ███ |
| ████ | ███ | ████ | ████ | ██ | ████ | █ | ███ | ███ |
| ████ | ██ | ████ | ████ | ██ | ███ | █ | ███ | ███ |
| █████ | ██ | ████ | ████ | ██ | ███ | █ | ███ | ███ |
| █████ | ██ | ████ | ████ | ██ | ███ | █ | ███ | ███ |
| ████ | ████ | ████ | ████ | ██ | ████ | █ | ███ | ███ |
| ████ | ████ | ████ | ████ | ██ | ███ | █ | ███ | ███ |
| ████ | ███ | ████ | ████ | ██ | █████ | █ | ███ | ███ |

| Beneficiary ID | Claim IDs | SNF | Admission Date | Age/ Gender/ Race | Inpatient Principal Diagnosis | Days of Ultra High Rehab | Days of Excess Ultra High Rehab | False Claim Amount |
|---|---|---|---|---|---|---|---|---|
| ███ | ███ | ███ | ███ | ███ | ███ | █ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | █ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | █ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | █ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | █ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | █ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | █ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | █ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | █ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | █ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | █ | ███ | ███ |

| Beneficiary ID | Claim IDs | SNF | Admission Date | Age/ Gender/ Race | Inpatient Principal Diagnosis | Days of Ultra High Rehab | Days of Excess Ultra High Rehab | False Claim Amount |
|---|---|---|---|---|---|---|---|---|
| ███ | ███ | ███ | ███ | ███ | ███ | █ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | █ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | █ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | █ | ███ | ███ |
| ███ | ███ | █ | ███ | ███ | ███ | █ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | █ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | █ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | █ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | █ | ███ | ███ |

| Beneficiary ID | Claim IDs | SNF | Admission Date | Age/ Gender/ Race | Inpatient Principal Diagnosis | Days of Ultra High Rehab | Days of Excess Ultra High Rehab | False Claim Amount |
|---|---|---|---|---|---|---|---|---|
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |

| Beneficiary ID | Claim IDs | SNF | Admission Date | Age/ Gender/ Race | Inpatient Principal Diagnosis | Days of Ultra High Rehab | Days of Excess Ultra High Rehab | False Claim Amount |
|---|---|---|---|---|---|---|---|---|
| ██ | ██ | ██ | ██ | ██ | ██ | █ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | █ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | █ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | █ | ██ | ██ |

> **2.** **The Large Proportion of Patients Receiving I) Exactly 100 Days of Ultra High Rehab and II) Over 60 Days of Ultra High Rehab Demonstrate Creative's Attempts to Maximize Medicare Reimbursements**
>
> > **A. Creative Treats an Abnormally High Amount of Patients with Ultra High Rehab up Until Medicare Coverage Expires at 100 Days**

73.     According to CMS, the Medicare benefit for patients being treated at a SNF runs

out after 100 days of SNF services. At that point Medicare will no longer reimburse for skilled

nursing services, and the patient must either pay out of pocket or would stop receiving skilled nursing services all together. Thus, a facility attempting to maximize revenue would treat its patients for as many days of Ultra High Rehab as possible under the benefit period. Relator found a significant number of patients at Creative received exactly 100 days of Ultra High Rehab relative to other SNFs, as demonstrated in Figure 5, indicating that Creative is seeking to maximize the level of Ultra High Rehab provided until the benefit expires.

74. Nationwide, 0.48% of SNF patients receive exactly 100 days of Ultra High Rehab, while 3.74% of patients at Creative receive exactly 100 days of Ultra High Rehab. Creative has more than 7.8 times as many patients who receive exactly 100 days of Ultra High Rehab than other facilities where such a spike is unusual and uncommon. The probability that this difference is due to random chance is less than 1 in 100 million.

75. Such patterns would be unlikely to occur but for an intentional effort by Creative's management to maximize the amount of Ultra High Rehab provided. The high number of patients receiving 100 days of Ultra High Rehab is consistent with what Relator was told by former therapists and therapy assistants. One former therapy assistant noted that Creative strives to put everyone on Ultra High and that therapists would have to put up a fight to get the amount of therapy lowered. Additionally, another therapy assistant who worked at Devine recalled receiving orders to exhaust the Medicare Part A reimbursement by providing therapy for the full 100 days, even when it was not warranted. This therapy assistant stated that in order to find things to do with patients, she was asked to perform non-therapy tasks that a certified nurse assistant could perform.

**Figure 5. Histogram of Ultra High Rehab Treatment Length for Creative and Non-Creative Patients.**
The following figure plots, for each Ultra High Rehab treatment length between 1 and 100 days, the percentage of patient admissions where the patient received exactly that many days of Ultra High Rehab treatment. The red histogram displays patients treated at a Creative SNF, and the blue histogram displays patients treated elsewhere. There were more than 13 million patient admissions in the data set, including more than 20,000 patient admissions at Creative facilities.



## B. The Spike in Patients Receiving Exactly 100 Days of Ultra High Rehab is Consistent Across Creative Facilities

76.     The abnormally high amount of patients receiving Ultra High Rehab for 100 days is consistent across all Creative facilities, and several Creative facilities have an extremely high proportion of patients receiving exactly 100 days of Ultra High Rehab. Figure 6 shows how it is incredibly rare for an SNF to have more than 5% of its patients receiving exactly 100 days of Ultra High Rehab, occurring at only 1.95% of facilities nationwide. However, at 12 of 47 Creative facilities (25.53%) with at least 100 admissions, more than 5% of patients receive exactly 100 days of Ultra High Rehab. Moreover, 3 Creative facilities bill more than 10% of their patients as receiving exactly 100 days of Ultra High Rehab.

**Figure 6. Histogram: Proportion of Patient Admissions Receiving Exactly 100 days of Ultra High Rehab.**
The following figure shows, for each proportion between 0% and 15%, the number of SNFs treating that proportion of patient admissions with exactly 100 days of Ultra High Rehab. Only facilities that treated at least 100 patient admissions from 2012 through 2018 are included here. The figure comprises more than 14,000 SNFs in the data set, including 47 Creative facilities.  Proportions for individual Creative facilities are marked, as are the overall and Creative averages. There are 3 non-Creative SNFs with a proportion higher than 15% that are excluded from the following histogram.



77.    Further, Figure 7 shows just how extreme of an outlier some individual Creative facilities are in terms of the proportion of admissions receiving exactly 100 days of Ultra High Rehab. Creative has 28 facilities in the top 5 percent of all facilities when ranked by proportion of patient admissions being exactly 100 days, including 12 in the top 2 percent. The probability of having 12 (out of 47) in the top 2 percent randomly is less than 1 in 100 million.

**Figure 7. Distribution of the Proportion of Patient Admissions Receiving Exactly 100 Days of Ultra High Rehab.** The following figure shows, for each SNF, the proportion of patients who receive exactly 100 days of Ultra High Rehab on an admission. Creative facilities are in red and all other SNFs are in blue. The figure comprises more than 14,000 facilities with at least 100 patient admissions from 2012 through 2018, including 47 Creative facilities.



78.     The fact that so many patients receive the maximum number of days of Ultra High Rehab covered under Medicare rules indicates that Creative is simply seeking to maximize reimbursements for as many days as possible, and the analysis demonstrates that Creative is making rehab decisions in order to maximize profits rather than providing patients with rehab that is reasonable and necessary.

### C.  Creative Maximized Revenue by Providing Ultra High Rehab to High Proportion of Patients for 60 or More Days

79.     Just as it is striking that such a relatively large proportion of Creative's patients are receiving Ultra High Rehab until the Medicare benefit expires at 100 days, Creative's attempt to maximize revenue is also evidenced by the large number of patients who receive 60 or more days of Ultra High Rehab. This finding is further demonstrated by the relative scarcity of this occurrence at non-Creative facilities, as shown in Figure 8 below. As seen in Panel A of Figure 8, 15.83% of

Creative patients receive 60 or more days of Ultra High Rehab on an SNF admission, compared to only 4.37% of patients at non-Creative facilities. Creative has 3.62 times as many patients receive 60 or more days of Ultra High Rehab than do patients at other SNFs. Panel B of Figure 8 shows the percent of patient admissions receiving at least a given number of days of Ultra High Rehab across all admissions at Creative compared to non-Creative SNFs. This figure also demonstrates Creative's tendency to consistently provide Ultra High Rehab as many days as possible, as evidenced by the gap between the red line for Creative and the blue line for other non-Creative SNFs.

**Figure 8. Distribution of When Patients Stop Receiving Ultra High Rehab on an Admission.**
Panel A compares the proportion of patients receiving at least 60 days of Ultra High Rehab at Creative and non-Creative SNFs. Panel B shows the percentage of all patients receiving the given number of days of Ultra High rehab identified on the x-axis.

*Panel A: Proportion of Patients Receiving Ultra High Rehab for at Least 60 Days*



*Panel B: Proportion of Patients Treated with Ultra High Rehab at Least a Given Number of Days*



### 3. Alternative Hypotheses for Excessive Ultra High Rehab Do Not Stand and Confirm that Creative Fraudulently Billed Medicare

80. To determine responsibility for the excessive Ultra High Rehab at Creative, Relator analyzed whether the statistically aberrant amounts of Ultra High Rehab could be attributed to a variety of external factors. First, Relator ran a fixed effect linear regression model to control for a variety of possible explanations for Ultra High Rehab, including patient health, patient characteristics and county demographic data. Second, Relator analyzed Creative's acquisitions of SNFs to determine whether there was a significant increase in the amount of Rehab provided after Creative gained ownership and operational control. Third, Relator considered whether a patient's diagnosis at the SNF, as opposed to their prior diagnosis inpatient hospital diagnosis, could explain the Ultra High Rehab. Fourth, Relator considered whether the patient's overseeing physician is responsible for the excessive Ultra High Rehab reimbursements at Creative. Fifth, Relator considered whether the excessive Ultra High Rehab could be explained by the referring hospital

or the attending physician during the patient's inpatient hospital stay. As discussed further below, these analyses prove that the excessive Ultra High Rehab can be directly attributed to Creative's fraudulent activity as opposed to external factors, indicating that the fraud was known by the system and was intentional.

### A. Patient Characteristics and Demographics do not Explain the Excessive Ultra High Rehab at Creative

81.     A fixed effect linear regression model allowed Relator to control for the possibility that there are certain patient characteristics which might suggest a patient needs extra rehab. Relator's regression isolated the amount of Ultra High Rehab beyond such characteristics and caused only by Creative. Using this methodology, Relator controlled for patient characteristics such as age, gender, and race. Relator also used county-level demographic data, such as unemployment rate, percent of population without a high school diploma, log median income, and the rural-urban continuum codes from the Department of Agriculture as control variables.[32] These county demographic variables provided Relator with a proxy for the income levels, education levels, and access to care available to the patients. Lastly, Relator controlled for the principal diagnosis by grouping together principal diagnosis codes in a manner consistent with their statistical analysis, as well as any inpatient secondary diagnoses, whether the patient had surgery, and the patient's prior length of stay at the inpatient hospital. These enabled Relator to estimate the severity of the patient's condition and need for receiving therapy. Equation 1 shows the fixed effect linear regression model used by Relator.

---

[32] The Rural-Urban Continuum Codes measure whether each county is in a metro or non-metro area and reflect the overall size of the metropolitan area.

**Equation 1. Relator's Fixed Effect Linear Regression Model.**
The following equation presents the fixed effect linear regression model used by Relator. The variable of interest is $\beta_1$, which is the coefficient for Creative. Panel A provides the equation, and Panel B explains the variables included in the model. The $i$ refers to a specific admission and $j$ refers to the potential options for the categorical variables.

**Panel A – Regression Model**

$Ult\_Rehab\_Los_i$

$$= \beta_0 + \beta_1 . Creative_i + \sum_{j=2}^{58} \beta_{2j}. Inp\_Pri\_Diag_{ij} \times Last\_Inp\_Los_i + \sum_{j=2}^{6} \beta_{3j}. Age_{ij}$$

$$+ \beta_4. Male_i + \beta_5. Race_i + \sum_{j=2}^{58} \beta_{6j}. Inp\_Pri\_Diag_{ij} \times Last\_Inp\_Surg_i + \sum_{j=2}^{9} \beta_{7j}. RUCC_{ij}$$

$$+ \beta_8. Pov\_Rate_i + \beta_9. Log\_Med\_Inc_i + \beta_{10}. Unemp\_Rate_i + \beta_{11}. No\_HS\_Rate_i$$

$$+ \sum_{j=2}^{589} \beta_{12j}. Inp\_Sec\_Diag_{ij} + \sum_{j=2}^{4} \beta_{13j}. Season_{ij} + \varepsilon_i$$

**Panel B – Explanation of Variables**

| Variable | Description |
| --- | --- |
| $Ult\_Rehab\_Los_i$ | Days of Ultra High Rehab treatments for patient $i$ |
| $\boldsymbol{Creative_i}$ | Whether patient $i$ was treated at Creative |
| $Inp\_Pri\_Diag_{ij}$ | Last inpatient principal diagnosis group dummy variables for patient $i$ |
| $Last\_Inp\_Los_i$ | Last inpatient length of stay at hospital for patient $i$ |
| $Last\_Inp\_Surg_i$ | Whether the last inpatient claim was assigned to a surgical DRG |
| $Inp\_Sec\_Diag_{ij}$ | Last inpatient secondary diagnosis ccs_1 category dummy variables for patient $i$ |
| $Season_{ij}$ | Season control variable for the SNF admission (Winter, Spring, Summer, Fall) |
| $Age_{ij}$ | Patient's age on the admission. |
| $RUCC_{ij}$ | Patient's rural urban continuum code based on the county. |
| $Male_i$ | Whether patient $i$ was a male. |
| $Pov\_Rate_i$ | County poverty rate in 2014. |
| $Unemp\_Rate_i$ | County unemployment rate in 2014 |
| $Log\_Med\_Inc_i$ | County log median income in 2014 |
| $No\_HS\_Rate_i$ | County percentage of individuals without a high school degree in 2010 |
| $\varepsilon_i$ | Error term |

82.    By controlling for these characteristics, the regression model allowed Relator to isolate the impact that being treated at Creative would have on a patient's expected days of Ultra High Rehab. For example, given two patient's with the same age and gender, from the same county, with the same principal and secondary diagnoses from their prior inpatient stay, same surgery status, and same length of stay, the Creative patient would on average receive 11.68 more days of Ultra High Rehab than the patient at a non-Creative facility.

83.     Table 4 shows the results of the fixed effect linear regression, and after controlling for other factors, it shows that the Creative coefficient for days of Ultra High Rehab is 11.68. This means that after considering the characteristics included in Equation 1, patients at Creative can be expected to receive an extra 11.68 days of Ultra High Rehab beyond what would be given at other facilities. Given the baseline average days of Ultra High Rehab at other facilities is 15.47 days, Creative's average days of Ultra High Rehab is 175.5% that of other SNFs, even after controlling for basic patient and demographic characteristics. This result is highly statistically significant with the probability that this observed difference is due to random chance being less than 1 in 100 million. The regressions indicate that Ultra High Rehab rates at Creative are extremely outside of the norms of what is acceptable and reasonable in industry for patients with similar characteristics.

**Table 4. Results of Fixed Effect Linear Regression Model**
Relator used a linear regression to analyze approximately 14 million admissions at Creative and other SNFs. The results are presented in the following table. The coefficient is listed first and the p-value is in parenthesis, which represents the statistical significance of the coefficient. A lower p-value means the result is more statistically significant. Coefficients were not included for categorical variables and instead are labeled with a "Yes" to indicate the variable was controlled for in the regression. The Creative coefficient is added to the rate at other facilities to get the expected Creative days of Ultra High Rehab after including controls.

| | Regression Coefficients |
| --- | --- |
| | *(See description in table header)* |
| Poverty Rate | 0.0051 |
| | (0.0248) |
| Unemployment Rate | 0.1763 |
| | (<0.0001) |
| Log Median Income | 1.1713 |
| | (<0.0001) |
| No High School Diploma Rate | 0.2221 |
| | (<0.0001) |
| Season Control Variables | Yes |
| Age Control Variables | Yes |
| Sex Control Variables | Yes |
| Race Control Variables | Yes |
| Inpatient Length of Stay × Inpatient Principal Diagnosis Category | Yes |
| Inpatient Surgical DRG × Inpatient Principal Diagnosis Category | Yes |
| Inpatient Secondary Diagnosis Categories | Yes |
| RUCC Control | Yes |
| Creative Coefficient for Unexplained Ultra High Rehab | 11.68 |
| | (<0.0001) |

| | |
|---|---|
| Other Facilities Average | 15.47 |
| **Creative Calculated Effect** | **27.15** |
| **Creative Relative Effect** | **175.5%** |

84.     Another regression method to estimate Creative's effect on Ultra High Rehab is to estimate the regression without the controls for skilled nursing chain and create an estimate of the expected days of Ultra High Rehab for each individual claim. For each skilled nursing chain, the average difference between the predicted days of Ultra High Rehab from the regression and the actual days of Ultra High Rehab billed on the claim is calculated, which is referred to as a residual. The difference between these two values represents the unexplained Ultra High Rehab that is caused by each skilled nursing chain. Figure 9 shows the average days of unexplained Ultra High Rehab for each skilled nursing chain, with Creative plotted in red. Creative's average unexplained Ultra High Rehab by this measure is 11.56 days, making it the 3rd highest among all skilled nursing chains with at least 5,000 admissions.

**Figure 9. Average Unexplained Ultra High Rehab for SNF Chains.**
The following figure plots the results of the regression from Equation 1, but run without the Creative fixed effect variable. All other variables included were the same. The regression was run based on 333 SNF chains with at least 5,000 patient admissions from 2012 through 2018Q1. The small vertical lines off of the point estimates represent the confidence interval for the systems' unexplained Ultra High Rehab. Because chains with at least 5,000 admissions were included, the large number of admissions result in small confidence intervals.



85.     Relator also performed analysis of individual facilities to demonstrate that the excessive Ultra High Rehab is taking place across the majority of Creative's SNFs, as opposed to a few rogue facilities. Relator re-estimated the regression described in Equation 1, except instead of one fixed effect control variable for Creative, individual fixed effect variables were included for each of Creative's facilities. Figure 10 plots the results of that regression for each individual Creative facility. As shown in the graph, the amount of extra Ultra High Rehab at each individual facility ranges from 0.84 extra days of Ultra High Rehab at El Paso II to 26.13 extra days at Jacksonville.

47

**Figure 10. Excessive Days of Ultra High Rehab at Individual Creative Facilities.**
The following figure displays the estimated regression coefficients and 95 percent confidence intervals for 48 Creative SNFs. The coefficient represents the amount of Ultra High Rehab attributed to the individual facilities after controlling for other factors. A coefficient of zero suggests the facility is not engaging in any unnecessary or excessive Ultra High Rehab.



86.     As an additional analysis at the facility level, Relator used the regression from Equation 1 but without the Creative fixed effect variable, and calculated the residual, or unexplained Ultra High Rehab for each facility. Figure 11 plots the average unexplained Ultra High Rehab for each facility, and, when compared to other facilities, it is apparent that Creative's distribution is skewed significantly to the right of the chart. This demonstrates that all of the Creative facilities have significant amounts of unexplained Ultra High Rehab.

**Figure 11. All SNFs, Ranked by Their Average Residuals.**
The following figure shows the average residuals from our regression analysis across more than 14,000 SNFs with at least 100 patient admissions. Higher residuals suggest higher amounts of unexplained Ultra High Rehab. Creative facilities are highlighted in red, and other facilities are in blue.



87.     Taken together, Relator's regression analyses demonstrate that the excessive Ultra High Rehab at Creative facilities cannot be explained due to unique patient demographic or health characteristics. Additionally, this behavior is consistent across nearly all of Creative's facilities, indicating it required coordinated effort.

### B.  Creative's Acquisition of New Facilities Demonstrates that Creative Management Causes the Excessive Ultra High Rehab

88.     Creative's fraudulent conduct can also be proven using causal methods, which are often used in economics, finance and other applications to assess the extent to which an effect can be identified to be caused, and not merely associated with, other explanatory variables.[33] A common causal econometric methodology is the use of discontinuity analysis which can be applied

---

[33] "The notion of ceteris paribus—that is, holding all other (relevant) factors fixed—is at the crux of establishing a causal relationship," Jeffrey Wooldrige, "Econometric Analysis of Cross Section and Panel Data", The MIT Press, second edition, 2010, page 3.

when there is a sudden change in the effect that one wishes to examine.[34] A discontinuity analysis is able to determine whether there is a statistically significant sudden change in the level of therapy due to an additional explanatory variable, such as a change in ownership or management of an SNF. One common causal econometric methodology that can be used to prove Creative's fraudulent conduct is known as a Comparative Interrupted Time Series (CITS), which can be applied to examine a sudden change in an effect in order to infer a causal relationship.[35] In this case, Creative's causal influence on the amount of Ultra High Rehab provided by an SNF can be estimated by comparing the SNF's average days of Ultra High Rehab before it was acquired by Creative to its amount of Ultra High Rehab after it was acquired by Creative.

89.     Creative acquired 10 SNFs from 2012 through 2015, and prior to the acquisitions, these SNFs were unaffiliated with Creative.[36] The timing of the acquisitions presented Relator with an opportunity to use the discontinuity associated with the sudden shift of operational control at the SNFs to assess the impact Creative has on the average amount of Ultra High Rehab provided to patients. Seven of these facilities had at least nine months of claims data before and after the acquisition, providing Relator with sufficient data to analyze Creative's impact on the rate of Ultra High Rehab after the acquisition. Relator presents detailed results for three SNFs acquired by Creative, and then presents the aggregate effect of all seven facilities pre- and post-acquisition.[37]

---

[34] *See* Angrist, J.D. and Pischke, J.S., "Mostly Harmless Econometrics: An Empiricist's Companion", Princeton University Press, 2009, pp. 251 - 253.

[35] Somers, et. al. found that "CITS... produce[s] causally valid inferences about program impacts." Somers, M., Zhu, P., Jacob, R., Bloom, H., *The Validity and Precision of the Comparative Interrupted Time Series Design and the Difference-in-Difference Design in Educational Evaluation*, MDRC Working Paper on Research Methodology, September 2013.

[36] Relator determined ownership and acquisitions dates from the CMS Skilled Nursing Facility Ownership Data, with a processing date of August 1, 2017, retrieved from https://data.medicare.gov/Nursing-Home-Compare/Ownership/r782-25kt.

[37] Five of the seven SNFs experienced a statistically significant increase in the days of Ultra High Rehab after being acquired by Creative. The other two were already providing high amounts of Ultra High Rehab prior to the acquisition.

i.      *Bexar's Increase in Ultra High Rehab After its Acquisition by Creative Indicates that Ultra High Rehab is Caused by Creative's Practices*

90.     Creative became the owner of Bexar on August 9, 2013 and took over operational and managerial control on October 1, 2013.[38] Relator examined the average days of Ultra High Rehab at Bexar before and after its respective affiliation with Creative. Relator added an additional 30-day gap after the operational control went into effect to account for the possibility that it might take time to implement new practices to maximize revenue. As shown in Figure 12, prior to the acquisition by Creative, Bexar's average days of Ultra High Rehab was consistent with the industry average. However, after Creative assumes operational control, Bexar's rate of Ultra High Rehab increases suddenly and is consistently higher than the nation-wide average at other non-Creative SNFs.

---

[38] Relator determined ownership and acquisitions dates from the CMS Skilled Nursing Facility Ownership Data, with a processing date of August 1, 2017, retrieved from https://data.medicare.gov/Nursing-Home-Compare/Ownership/r782-25kt.

**Figure 12. CITS for Creative's Acquisition of Bexar.**
This figure shows the average days of Ultra High Rehab over time at Bexar (red) and at other non-Creative SNFs (blue) for the two years before and after Creative's acquisition of Bexar. Each dot represents a 120-day bucket with admissions allocated based on the median date of the admission. The red line shows the results of the CITS analysis for Creative's acquisition of Bexar. All admissions from the signing of the purchase agreement to 30-days after its approval were not included in the CITS but were included on the graph for completeness and are greyed out. The jump from the first line to the next demonstrates the impact of the management change on Bexar's Ultra High Rehab.



91.     The red line in Figure 12 also shows the results of the Comparative Interrupted

Time Series (CITS) analysis. The CITS demonstrates that there is a significant jump in the amount

of Ultra High Rehab after the acquisition by Creative. The graph is based on the CITS formula

shown in Equation 2 below, which allowed Relator to compare differences in Ultra High Rehab

for patients treated at Bexar before and after the acquisition change relative to the behavior of other

facilities.[39] The advantage of this approach is that it allowed Relator to identify and quantify not only the short-term effect of management change on the immediate increase in Ultra High Rehab, but also the long-term effect in the post-acquisition trend of Ultra High Rehab. Relator's CITS analysis shows the average days of Ultra High Rehab at Bexar increased on average 7.50 days after the acquisition. The probability this jump is due to random chance is less than 1 in 100 million, thus validating that change in operational control caused an increase in the Ultra High Rehab.

92.     Relator also ran a Comparative Interrupted Time Series (CITS) analysis while controlling for a variety of patient characteristics, the equation of which is located in Equation 2 below, including the additional control variables. This allowed Relator to control for patient characteristics such as age, race, and gender, claim characteristics such as the principal and secondary diagnoses, and regional characteristics such as income and unemployment levels in the patient's home county. Such an analysis allowed the Relator to identify the amount of the increase in Ultra High Rehab that can be attributed to the Creative acquisition, while controlling for possible changes in the composition of patients before and after the acquisition. As such, the variable of interest represents the incremental amount of Ultra High rehab that can be attributed to the management change beyond what could be explained by the other variables. After controlling for the other variables, the effect of the acquisition was estimated to be 8.65 days, meaning the new management agreement caused an average increase of 8.65 days of Ultra High Rehab. The probability this difference is due to random chance is less than 1 in 100 million.

---

[39] Because the graph only includes two dimensions, the CITS for the graph does not include the patient and demographic controls identified in Equation 1.

ii.    *Mineral Wells' Increase in Ultra High Rehab After its Acquisition by Creative Indicates that Ultra High Rehab is Caused by Creative's Practices*

93.    Creative took over the ownership and operational control of Mineral Wells on January 1, 2013.[40] Relator examined the average days of Ultra High Rehab at Mineral Wells before and after its respective affiliation with Creative. Relator added a 30-day gap after the acquisition to account for the possibility that it might take time to implement new practices to maximize revenue. As shown in Figure 13, prior to entering into the agreement with Creative, Mineral Well's average days of Ultra High Rehab was consistent with the nation-wide average at non-Creative SNFs. However, after the acquisition, Mineral Well's rate of Ultra High Rehab increases suddenly and is higher than the average at non-Creative SNFs, and remains higher after the acquisition, indicating it wasn't a temporary change in behavior or simply an aberration.

---

[40] Relator determined ownership and acquisitions dates from the CMS Skilled Nursing Facility Ownership Data, with a processing date of August 1, 2017, retrieved from https://data.medicare.gov/Nursing-Home-Compare/Ownership/r782-25kt.

**Figure 13. CITS for Creative's Acquisition of Mineral Wells.**
This figure shows the average days of Ultra High Rehab over time at Mineral Wells (red) and other non-Creative SNFs (blue) for the two years before and after Creative's acquisition of Bexar. Each dot represents a 120-day bucket with admissions allocated based on the median date of the admission. The red line also shows the results of the CITS analysis for Creative's acquisition of Mineral Wells. All admissions from the signing of the purchase agreement to 30-days after its approval were not included in the CITS but are shown in the graph for completeness and greyed out. The jump from the first line to the next demonstrates the impact of the acquisition on the Ultra High Rehab.



94.    To demonstrate that the change in rate of Ultra High Rehab was caused by the affiliation, the red line in Figure 12 also shows the results of the Comparative Interrupted Time Series (CITS) analysis for Creative's acquisition of Mineral Wells. The CITS demonstrates that there is a significant jump in the amount of Ultra High Rehab after the acquisition by Creative.

The graph is based on the CITS formula shown in Equation 2 below.[41] Relator's CITS analysis shows the average days of Ultra High Rehab increased on average 12.01 days immediately after the management agreement. The probability this jump is random is less than 1 in 100 million, thus validating that change in operational control caused an increase in the Ultra High Rehab.

95.     To identify the amount of the increase in Ultra High Rehab that can be attributed to Creative's acquisition of Mineral Wells, while controlling for patient characteristics before and after the acquisition, Relator also ran a Comparative Interrupted Time Series (CITS) analysis with controls for such patient characteristics, the equation of which is located in Equation 2 below. The variable of interest represents the incremental amount of Ultra High rehab that can be attributed to the management change beyond what could be explained by the other variables. After controlling for the other variables, the effect of the management services agreement was estimated to be 12.08 days, meaning the new management agreement caused an average increase of 12.08 days of Ultra High Rehab. The probability this difference is due to random chance is less than 1 in 100 million.

> iii.     *Lubbock II's Increase in Ultra High Rehab After its Acquisition by Creative Indicates that Ultra High Rehab is Caused by Creative's Practices*

96.     Similar to its acquisition of Bexar, Creative became the owner of Lubbock II on July 26, 2012 and took over operational and managerial control on November 1, 2012.[42] Relator examined the average days of Ultra High Rehab at Lubbock II before and after its respective affiliation with Creative. Relator added a 30-day gap after the acquisition to account for the possibility that it might take time to implement new practices to maximize revenue. As shown in Figure 13, prior to entering into the agreement with Creative, Lubbock II's average days of Ultra

---

[41] Because the graph only includes two dimensions, the CITS for the graph does not include the patient and demographic controls identified in Equation 1.

[42] Relator determined ownership and acquisitions dates from the CMS Skilled Nursing Facility Ownership Data, with a processing date of August 1, 2017, retrieved from https://data.medicare.gov/Nursing-Home-Compare/Ownership/r782-25kt.

High Rehab was consistent with the nation-wide average at non-Creative SNFs. However, after the acquisition, Lubbock II's rate of Ultra High Rehab increases suddenly and is higher than the average at non-Creative SNFs, and generally remains higher after the acquisition, indicating it wasn't a temporary change in behavior or simply an aberration.

**Figure 14. CITS for Creative's Acquisition of Lubbock II.**
This figure shows the average days of Ultra High Rehab over time at Lubbock II (red) and other non-Creative SNFs (blue) for the two years before and after Creative's acquisition of Bexar. Each dot represents a 120-day bucket with admissions allocated based on the median date of the admission. The red line also shows the results of the CITS analysis for Creative's acquisition of Lubbock II. All admissions from the signing of the purchase agreement to 30-days after its approval were not included in the CITS but are shown in the graph for completeness and greyed out. The jump from the first line to the next demonstrates the impact of the acquisition on the Ultra High Rehab.



97.     To demonstrate that the change in rate of Ultra High Rehab was caused by the

affiliation, the red line in Figure 12 also shows the results of the Comparative Interrupted Time

Series (CITS) analysis for Creative's acquisition of Lubbock II. The CITS demonstrates that there

is a significant jump in the amount of Ultra High Rehab after the acquisition by Creative. The graph is based on the CITS formula shown in Equation 2 below.[43] Relator's CITS analysis shows the average days of Ultra High Rehab increased on average 22.34 days immediately after the management agreement. The probability this jump is random is less than 1 in 100 million, thus validating that change in operational control caused an increase in the Ultra High Rehab.

98.     To identify the amount of the increase in Ultra High Rehab that can be attributed to Creative's acquisition of Lubbock II, while controlling for patient characteristics before and after the acquisition, Relator also ran a Comparative Interrupted Time Series (CITS) analysis with controls for such patient characteristics, the equation of which is presented in Equation 2 below. The variable of interest represents the incremental amount of Ultra High rehab that can be attributed to the management change beyond what could be explained by the other variables. After controlling for the other variables, the effect of the management services agreement was estimated to be 22.36 days, meaning the new management agreement caused an average increase of 22.36 days of Ultra High Rehab. The probability this difference is due to random chance is less than 1 in 100 million, meaning this effect is almost certainly caused by Creative's acquisition.

99.     Relator's detailed methodology to attribute the change in the average Ultra High Rehab to Creative's acquisition of the facilities is based on the CITS formula in Equation 2. The detailed patient level controls are discussed in more detail in Equation 1 in on page 44. The contemporaneous effect of the management change on the days of Ultra High Rehab at Bexar, Mineral Wells, or Lubbock II is estimated through the $\beta_{21}$ coefficient, which represents the extra Ultra High Rehab found in Bexar, Mineral Wells, or Lubbock II (i.e. the jump in the days of Ultra High Rehab) after adjusting for the pre- and post-acquisition trends at non-Creative SNFs, and also

---

[43] Because the graph only includes two dimensions, the CITS for the graph does not include the patient and demographic controls identified in Equation 1.

after adjusting for control variables. Although not shown in the figures above, there was no jump

in the rate of Ultra High Rehab at non-Creative SNFs before and after the acquisition periods.

**Equation 2. Relator's Comparative Interrupted Time Series (CITS) Model.**
The following equations present the CITS model used by Relator. The aggregate short-run and long-run effect of management change on the days of Ultra High Rehab at Bexar, Mineral Wells, or Lubbock II is estimated through the variable $\beta_{21}$. This represents the jump in the days of Ultra High Rehab due to the Creative acquisition while assuming that Bexar's, Mineral Wells', or Lubbock II's average days of Ultra High Rehab would increase at the same rate as other SNFs.

*Panel A – CITS Model*

$$Y_i = \beta_{00} + \beta_{01}T_i + \beta_{10}time_{1_i} + \beta_{20}rd_{int_i} + \beta_{21}rd_{int_i}T_i + \beta_{30}time_{2_i} + \boldsymbol{\beta C_i} + \varepsilon_i$$

*Panel B – Explanation of Variables*

| Variable | Description |
|---|---|
| $T_i$ | Whether patient $i$ was treated at the SNF of interest (Bexar, Mineral Wells, or Lubbock II) |
| $time_{1i}$ | Difference in days between the mid-point of the patient's admission and the gap for the acquisition time period. |
| $time_{2i}$ | If the patient was treated after the acquisition, the difference in days between the mid-point of the patient's admission and 30 days after the approval of the acquisition, zero if treated before the acquisition. |
| $rd_{inti}$ | Whether the patient was treated before or after the acquisition |
| $\boldsymbol{\beta C_i}$ | Control variables, including the controls identified in Equation 1 |

      *iv.*     *The Effect Continues to be Striking when Analyzing the Cumulative Effect of the Acquisitions Across Creative SNFs*

100.    In addition to analyzing individual facilities, the results for three which were just

presented, Relator analyzed the effect across all facilities in the aggregate. The benefits of this

approach is to increase the sample size for analysis and reduces random variation, providing a

more accurate assessment of Creative's effect on the rate of Ultra High Rehab after acquisitions.

Relator analyzed all Creative SNFs that were acquired between 2012 and 2015, which also had

nine months of claims data before and after acquisition in order to allow for sufficient analysis of

patient admissions before and after the acquisition. Seven SNFs met these criteria.[44] Relator took

the first date of ownership change for these seven SNFs and marked that as day zero, with all

---

[44] The seven SNFs included in this analysis are Bandera, Bexar, Lubbock I, Lubbock II, Lubbock III, Mineral Wells, and Rusk.

claims preceding Creative's ownership included in the pre-acquisition analysis. All claims more than 30 days after operational control was finalized were included on the post-acquisition claims data. The results of this analysis are shown in Figure 15.

**Figure 15. Analysis of Creative's Acquisition of SNFs.**
This figure shows the average days of Ultra High Rehab over time at Creative SNFs before and after their acquisition by Creative. Each dot represents a 90-day bucket with admissions allocated based on the median date of the admission. The red line shows the results of the analysis for Creative's acquisition of the facilities. The graph is based on 7 of 10 acquired Creative SNFs with at least 9 months of claims data before and after the acquisition. For each SNF, all claims from the date of ownership change to 30-days after the change in operational control were not included in the Figure. The jump from the first line to the next demonstrates the impact of the management change on the Ultra High Rehab at the Creative SNFs.



101.    The red lines in Figure 15 show the results of the discontinuity analysis centered around the acquisition of SNFs. The left line reflects the trend of average Ultra High Rehab during the two years preceding acquisition of the seven SNFs, while the right line reflects the trend after

the acquisition. The gap between the two lines at the point of the acquisitions is 9.55 days and represents the immediate impact of the days of Ultra High Rehab provided to patients after the acquisition. The jump was calculated using the CITS formula in Equation 2 on page 60.[45]

### C. Excessive Ultra High Rehab Cannot be Explained by Patients Diagnosis at the SNF

102.     Relator also analyzed whether something unique about the diagnosis assigned to the patients at Creative could explain why Creative's patients receive excessive Ultra High Rehab. Relator's previous analyses used patients' diagnosis assigned at their prior inpatient hospital stay as an independent and objective determination of their medical need for therapy; this additional test for robustness further confirms Creative's fraudulently excessive Ultra High Rehab.

103.     As shown in Figure 16, Creative has higher rates of Ultra High Rehab across all principal diagnosis code groups assigned at the SNFs. Specifically, in Panel A, each dot represents a principal diagnosis and the red dots to the right of the 45-degree line show that Creative provides more days of Ultra High Rehab than other facilities. For example, for patients diagnosed with Fracture of Neck of Femur (hip), Creative on average provides 34.82 days of Ultra High Rehab, whereas other facilities on average provide 21.57 days of Ultra High Rehab. Similarly, the distribution of average days of Ultra High Rehab by principal diagnosis code group, as shown in Panel B, continues to illustrate that Creative consistently bills more days of Ultra High Rehab. If the amount of Ultra High Rehab provided by Creative was comparable to other facilities across different SNF diagnosis codes, the dots would be clustered close to the 45-degree line and the distributions in Panel B would be similar.

---

[45] This figure excludes the patient and demographic variable controls because the graph is two-dimensional, and the figure excludes the comparison to the industry average because the acquisition dates varied across the seven SNFs, preventing the use of a control group. As a result, the following variables from Equation 2 were excluded from this analysis: $\beta_{01}T_i$, $\beta_{11}time_{1_i}T_i$, $\beta_{21}rd_{int_i}T_i$, and $\beta_{31}time_{2_i}T_i$.

**Figure 16. Rate of Ultra High Rehab by SNF Diagnosis for Creative and Other Facilities.**
Panel A of the following figure shows, for 58 SNF principal diagnoses, the average Ultra High Rehab treatment length for patient's thus diagnosed at Creative versus non-Creative facilities. Each dot represents a particular SNF principal diagnosis, e.g., generalized and specialized osteoarthritis and the size of the dot corresponds to its frequency. Relator only includes diagnoses where at least 30 Creative patients were thus diagnosed. Panel B compares the distributions of average Ultra High Rehab treatment lengths at Creative versus non-Creative facilities for the individual SNF principal diagnosis codes.

*Panel A: Scatterplot of Average Ultra High Rehab by SNF Principal Diagnosis*



*Panel B: Distribution of Average Ultra High Rehab by SNF Principal Diagnosis*



### D. Attending Physicians are not Responsible for the Excessive Ultra High Rehab

104.    Relator also considered whether the excessive Ultra High Rehab could be caused by the preferences or treatment decisions of physicians who work with patients at Creative's facilities as opposed to some system-wide decision or corporate directive. Could it be that the physicians who attended to patients at Creative facilities were more disposed to prescribing more intensive therapy than other physicians? To address this question, Relator analyzed the subset of claims for physicians who worked at both a Creative facility and other non-Creative facilities to determine whether their patients receive statistically different amounts of Ultra High Rehab at Creative than at other facilities. Across all admissions involving doctors that treat at least 11 patients at both Creative and other facilities, patient admissions at Creative have on average 26.89 days of Ultra High Rehab whereas admissions at other facilities have on average only 19.10 days of Ultra High Rehab, as shown in Figure 17. This means that when the same doctor oversees

patients at Creative and at other facilities, the patient admissions at Creative have 7.79 days of additional Ultra High Rehab than admissions at other facilities overseen by ***the same doctor***.

**Figure 17. Average Days of Ultra High Rehab for Claims Belonging to Common Doctors at Creative and Other Facilities.**
This figure shows the average days of Ultra High Rehab for patients treated by doctors that treat at least 11 patients at Creative and other facilities.



105.    Analyzing each common doctor individually further demonstrates how it is Creative, not doctors, that is responsible for excessive Ultra High Rehab. As shown in Figure 18, out of 172 doctors who treated at least 11 patients at both Creative and other non-Creative facilities, 127 (73.8 percent) had higher average days of Ultra High Rehab at Creative than at their other facilities. The probability that random chance explains this many doctors having higher rates of Ultra High Rehab among their patients at Creative than among their patients at other facilities is less than 1 in 100 million. The large statistical significance of this effect indicates it could not simply be due to physician judgment, but instead is indicative of a system-wide intent to provide rehab beyond what is medically reasonable and necessary to maximize revenue. Additionally, Panel B Figure 18 shows the distribution of average Ultra High Rehab days when these physicians

work at Creative versus other facilities, showing that the exact same doctors are more likely to have patients with excessive amounts of Ultra High Rehab when they are working with patients at Creative than at other facilities.

**Figure 18. Attending Physician Days of Ultra High Rehab at Creative Versus Other Facilities.**
The following figures show the comparison of Ultra High Rehab associated with physicians who treated at least 11 patients at Creative and other facilities. Panel A plots one point for each attending physician and shows the average days of Ultra High Rehab at Creative on the x-axis and at other facilities on the y-axis. The size of the dot corresponds to the number of patients the doctor had at Creative. Panel B compares the distribution of the average Ultra High Rehab treatment lengths for these doctors at Creative versus non-Creative facilities. The graphs are based on more than 18,000 patient admissions at Creative and approximately 88,000 patient admissions at other facilities for 172 common doctors.

*Panel A: Scatter Plot of Average Ultra High Rehab by Attending Physician*



*Panel B: Distribution of Average Ultra High Rehab by Attending Physician*



106.     Thus, the excessive amount of Ultra High Rehab provided at Creative cannot be explained by the professional opinion or judgment of the attending physicians serving at Creative but is instead due to system-wide practices in place at Creative through corporate policies or directives.

### E.  Excessive Ultra High Rehab is not Explained by the Referring Hospital or the Attending Physician During Patients' Inpatient Hospital Stay

107.     Relator considered whether the excessive Ultra High Rehab at Creative might be caused by care decisions that were made while the patients were being treated their prior inpatient facility. Specifically, Relator considered whether it was the referring hospital itself or the patient's attending physician at the referring hospital that influenced the amount of Ultra High Rehab provided. Conceivably, a particular hospital or physician could be treating—and discharging to SNFs—a patient population that required a more intensive rehabilitation therapy. To evaluate this

possibility, Relator first considered a subset of hospitals that send at least 11 patients to both Creative and other facilities and compared the average days of Ultra High Rehab when they send patients to Creative versus to those other facilities.

108.    Relator found that the average patient coming from these hospitals receives 26.85 days of Ultra High Rehab per admission at Creative, but only 18.74 days of Ultra High Rehab when discharged to another SNF.  Figure 19 Panel A shows the extent to which patients discharged from the same hospital receive higher amounts of Ultra High Rehab at Creative than at other facilities. The probability that Creative would have higher amounts of Ultra High Rehab for patients coming from 131 out of 154 (85.1%) referring hospitals is less than 1 in 100 million. Panel B shows the distribution of Ultra High Rehab across these hospitals, which is shifted significantly to the right for Creative's patients.

**Figure 19. Referring Hospital Days of Ultra High Rehab at Creative Versus at Other Facilities.**
The following figures show the analysis for hospitals that sent at least 11 patients to Creative and other facilities. Panel A plots one point for each referring hospital and shows the average days of Ultra High Rehab at Creative on the x-axis and at other facilities on the y-axis. The size of the dot corresponds to the number of patients discharged to Creative. Panel B compares the distribution of the average Ultra High Rehab treatment lengths for patients from these hospitals at Creative versus non-Creative facilities. The graphs are based on more than 19,000 patient admissions to Creative and more than 358,000 admissions to other facilities for 154 common referring hospitals.

*Panel A: Scatterplot of Average Ultra High Rehab by Referring Hospital*



71

*Panel B: Distribution of Days of Ultra High Rehab by Referring Hospital*



109.    To further consider whether the Ultra High Rehab length could be influenced by treatment decisions during the patient's inpatient hospital stay as well as the inpatient attending physician, Relator next analyzed a subset of claims for common inpatient attending physicians that treated at least 11 patients that later were discharged to both Creative and to other SNFs. Across this subset of claims, the average days of Ultra High Rehab for patients that were treated at Creative was 27.26 days, compared to 19.32 days at other facilities.

110.    The graphs in Figure 20 show that out of 449 common inpatient attending physicians, 365 (81.3%) had more days of Ultra High Rehab at Creative than at other facilities. This includes one doctor whose patients on average had 41.19 days of Ultra High Rehab when treated at Creative, but only 6.57 days of Ultra High Rehab on average when treated at other facilities. Panel A shows the sheer number of doctors whose patients had higher rates of Ultra High Rehab at Creative versus other facilities, whereas Panel B shows the distribution of days of Ultra

High Rehab by inpatient attending physician, illustrating Creative's significantly higher amounts of Ultra High Rehab even for the same physician at different facilities.

**Figure 20. Inpatient Attending Physician Days of Ultra High Rehab at Creative and Other Facilities.**
Panel A of the following figure shows, for each inpatient attending physician sending patients to both Creative facilities and other facilities, the average Ultra High Rehab treatment length for patients sent to Creative versus non-Creative facilities. Panel B compares the distributions of the averages at Creative versus non-Creative facilities.

*Panel A: Scatterplot of Average Ultra High Rehab by Inpatient Attending Physician*



*Panel B: Distribution of Days of Ultra High Rehab by Inpatient Attending Physician*



111.  This analysis shows that the excessive Ultra High Rehab at Creative cannot be attributed to care decisions made during patients' inpatient hospital stay prior to their SNF visit. Specifically, the fraudulent activity was not caused by the referring inpatient hospital itself, nor the attending physician during the inpatient hospital stay.

### F.  Summary of Determining What Caused the Excessive Ultra High Rehab

112.  Relator has considered a number of potential explanations above to determine what phenomenon or which institution or actor could be responsible for the high amounts of Ultra High Rehab at Creative. The excessive use of Ultra High Rehab is highly significant across 58 inpatient diagnosis groups and consistently excessive across 48 Creative facilities, indicating that it is not driven by a particular patient medical characteristic nor only a few Creative facilities. Relator eliminated the possibility that the excessive Ultra High Rehab might be justified by or due to patient characteristics, medical diagnoses or treatment, overseeing physician preferences, patient population at referring hospitals or inpatient physician behavior. Based on this, Relator has

demonstrated that the only plausible explanation as to the cause of the excessive Ultra High Rehab reimbursements is that Creative as a system has implemented practices to fraudulently maximize the amount of rehab it can bill to Medicare, beyond what is reasonable and necessary.

### 4.   Creative Keeps its Patients and Provides Skilled Nursing Services Longer than Necessary

#### A.   Creative Consistently Provides an Excessive Length of Stay for Patients Across Principal Diagnosis Groups

113.   In addition to providing excessive Ultra High Rehab during the length of stay, the evidence indicates that Creative is keeping its patients longer than necessary.[46] Relator evaluated whether Creative's patients needed skilled nursing care during the entirety of their stay at its facilities, or if the length of stay was excessive and unnecessary. Relator examined whether there was also excessive length of stay for patients by examining specific medical conditions upon admission. For the same 58 principal diagnosis categories analyzed previously, Relator found that Creative keeps patients for longer than other SNFs for all of the 58 of diagnosis categories, indicating that Creative keeps patients longer than needed for a given medical condition. For example, nationwide, the average patient with Pneumonia; Organism Unspecified will end up receiving approximately 27 days of skilled nursing care, whereas the average patient with Fracture of the Neck of Femur (hip) will end up receiving approximately 35 days of skilled nursing care at an SNF. Relators method incorporates this expectation that certain diagnoses might require greater amounts of skilled nursing care on average.

114.   Creative's excessive length of stay across a variety of principal diagnosis code groups is demonstrated in Figure 21. Panel A shows average length of stay at Creative on the x-axis (horizontal) and the average length of stay at all other non-Creative SNFs on the y-axis

---

[46] Length of stay in this section is calculated based on the total days an SNF billed for a patient's skilled nursing services on a given patient admission. This measure does not count days in which the patient stayed at a facility, but the facility was not reimbursed.

(vertical). Each dot in Panel A represents a principal diagnosis code group (bin) that patients had at their prior inpatient hospital stay. The size of the dots is proportional to the number of admissions at Creative, so that larger dots represent proportionally more admissions. If the average length of stay at Creative for each diagnosis code were similar to the average length of stay at other SNFs, then the dots would cluster on the 45-degree line. In Panel A, the red dots to the right of the 45-degree line show that Creative had higher lengths of stay for patients in all of the 58 inpatient principal diagnosis groups. ***The graph demonstrates that Creative's higher average length of stay is not due to having sicker patients*** , but rather is widespread even after controlling for patient's hospital diagnosis prior to admission to an SNF. The probability that random chance explains these many hospital diagnoses groups having patients with higher lengths of stay for admissions at Creative than among their admissions at other facilities is less than less than 1 in 100 million.

**Figure 21. Average Length of Stay for Patients Admitted to Both Creative and Other Facilities.**
Panel A shows, for 58 inpatient principal diagnosis groups (each represented by a dot), the average length of stay for patients thus diagnosed at Creative versus at non-Creative facilities. We include only diagnosis groups where at least 100 patients were thus diagnosed at Creative. Panel B shows the distribution of average length of stay at Creative versus at non-Creative facilities for each of the principal diagnosis groups.

*Panel A: Scatterplot of Average Length of Stay by Inpatient Principal Diagnosis*



*Panel B: Distribution of Average Length of Stay by Principal Diagnosis*



115.    To illustrate Creative's excessive length of stay, Creative had 1,208 patients diagnosed with Other Diseases of the Digestive System during their inpatient hospital stay prior to admission. These patients on average received 35.07 days of skilled nursing care at Creative per admission. However, patients at other facilities who were diagnosed with Other Diseases of the Digestive System only received 25.13 days of skilled nursing care on average.

116.    Additionally, for each principal diagnosis code group, Relator calculated the statistical probability that Creative's average length of stay would exceed the nationwide average length of stay. Relator found that Creative has statistically significant higher lengths of stay for patients diagnosed under 41 out of 58 of the principal diagnosis groups. These principal diagnosis code groups are identified on Table 5, along with the difference in length of stay and statistical probability. The table is ranked by those diagnoses groups with the most frequent admission at Creative, and the probabilities shown in the table demonstrate that these differences between Creative and non-Creative facilities could not be due to random chance.

**Table 5. Average Length of Stay by Principal Diagnosis Code Group.**

| Principal Diagnosis Group | # Admissions Creative | Avg. Length of Stay at Creative | Avg. Length of Stay at Other Facilities | Creative Rate Relative to Others | Statistical Significance[47] |
|---|---|---|---|---|---|
| Unspecified Septicemia | 1,667 | 34.73 | 26.89 | 129% | < 1 in 100 million |
| Fracture of Neck of Femur (hip) | 1,278 | 45.44 | 34.68 | 131% | < 1 in 100 million |
| Other Diseases of the Digestive System | 1,208 | 35.07 | 25.13 | 140% | < 1 in 100 million |
| Other Diseases of the Circulatory System | 860 | 35.22 | 25.08 | 140% | < 1 in 100 million |
| Pneumonia; Organism Unspecified | 859 | 39.85 | 26.72 | 149% | < 1 in 100 million |
| Other Injury and Poisoning | 858 | 37.62 | 29.93 | 126% | < 1 in 100 million |
| Urinary Tract Infection; Site Not Specified | 845 | 40.77 | 30 | 136% | < 1 in 100 million |
| Acute Renal Failure | 759 | 36.39 | 27.33 | 133% | < 1 in 100 million |
| Rehabilitation Care; Fitting of Prostheses; and Adjustment of Devices | 652 | 42.83 | 37.69 | 114% | < 1 in 19 thousand |
| Congestive Heart Failure; Nonhypertensive | 600 | 33.94 | 24.38 | 139% | < 1 in 100 million |
| Respiratory Failure | 567 | 33.54 | 26.22 | 128% | < 1 in 100 million |
| Occlusion of Cerebral Arteries | 563 | 40.7 | 32.47 | 125% | < 1 in 100 million |
| Obstructive Chronic Bronchitis | 512 | 35.4 | 24.66 | 144% | < 1 in 100 million |
| Other Endocrine; Nutritional; and Metabolic Diseases and Immunity Disorders | 473 | 34.4 | 27.69 | 124% | < 1 in 2 million |
| Delirium Dementia and Amnestic and Other Cognitive Disorders | 463 | 39.85 | 31.92 | 125% | < 1 in 35 million |
| Osteoarthritis; Localized | 376 | 25.05 | 16.6 | 151% | < 1 in 100 million |
| Other Diseases of the Musculoskeletal System and Connective Tissue | 367 | 29.21 | 22.79 | 128% | < 1 in 440 thousand |
| Acute Myocardial Infarction | 364 | 31.74 | 23.65 | 134% | < 1 in 14 million |
| Other Diseases of the Respiratory System | 347 | 33.3 | 25.74 | 129% | < 1 in 1 million |
| Hypertensive Heart and/or Renal Disease | 326 | 31.46 | 23.66 | 133% | < 1 in 8 million |
| Aspiration Pneumonitis; Food/vomitus | 300 | 39.02 | 27.94 | 140% | < 1 in 87 million |
| Other Diseases of the Nervous System and Sense Organs | 297 | 36.13 | 29.16 | 124% | < 1 in 20 thousand |
| Atrial Fibrillation | 272 | 30.53 | 25.23 | 121% | < 1 in 1 thousand |
| Infection and Inflammation--internal Prosthetic Device; Implant; and Graft | 264 | 34.04 | 28.06 | 121% | < 1 in 3 thousand |
| Other Diseases of the Genitourinary System | 262 | 38.44 | 26.77 | 144% | < 1 in 100 million |
| Other Symptoms; Signs; and Ill-defined Conditions and Factors Influencing Health Status | 251 | 37.33 | 28.63 | 130% | < 1 in 464 thousand |
| Other Diseases of the Blood and Blood-forming Organs | 240 | 34.86 | 25.76 | 135% | < 1 in 6 million |
| Diabetes with Other Manifestations | 221 | 39.23 | 29.59 | 133% | < 1 in 332 thousand |

---

[47] The statistical significance of these represents the probability that the difference between the average days of Ultra High Rehab at Creative and other facilities is due to random occurrences.

| | | | | |
|---|---|---|---|---|
| Other Central Nervous System Disorders | 220 | 34.82 | 27.97 | 124% | < 1 in 1 thousand |
| Cellulitis and Abscess of Leg | 210 | 37.87 | 29.05 | 130% | < 1 in 36 thousand |
| Depressive Disorders | 193 | 43.38 | 34.2 | 127% | < 1 in 7 thousand |
| E. Coli Septicemia | 172 | 38.31 | 27.07 | 141% | < 1 in 274 thousand |
| Hypovolemia | 172 | 40.16 | 29.38 | 137% | < 1 in 73 thousand |
| Fracture of Vertebral Column without Mention of Spinal Cord Injury | 171 | 39.81 | 29.97 | 133% | < 1 in 12 thousand |
| Other Diseases of the Skin and Subcutaneous Tissue | 155 | 38.68 | 29.62 | 131% | < 1 in 2 thousand |
| Other Bacterial Pneumonia | 142 | 37.61 | 25.3 | 149% | < 1 in 35 thousand |
| Intestinal Infection | 142 | 36.51 | 26.12 | 140% | < 1 in 37 thousand |
| Other Connective Tissue Disease | 136 | 39.41 | 30.09 | 131% | < 1 in 1 thousand |
| Other Venous Embolism and Thrombosis | 117 | 42.24 | 28.4 | 149% | < 1 in 1 million |
| Epilepsy | 112 | 41.53 | 28.62 | 145% | < 1 in 129 thousand |
| Coronary Atherosclerosis | 106 | 31.91 | 20.38 | 157% | < 1 in 159 thousand |

117.   The excessive length of stay is notable across all admissions in the aggregate as well. Figure 22 shows the distribution of the length of stay for all admissions at Creative versus other non-Creative facilities. As shown in the figure, Creative's distribution of length of stay is higher than the non-Creative distribution, demonstrating that Creative keeps its patient's longer than other facilities. For example, 45.65% of Creative's patients stay at least 30 days per admission, compared to 33.93% of patients at non-Creative facilities.

**Figure 22. Proportion of Patient Admissions by Length of Stay.**
This figure shows the percentage of patients receiving at least a given length of stay specified on the x-axis. Creative's distribution is in red and non-Creative facilities are in blue.



118.    The presence of excessive length of stay at Creative is even more notable for patients with higher lengths of stay. Specifically, 7.96% of patients at Creative stay for at least 100 days, whereas 2.19% of patients at other facilities stay for 100 days or more, meaning Creative has 3.63 times as many patients receiving 100 days or more of skilled nursing services per admission. Similarly, 22.66% of patients at Creative stay at least 60 days, whereas only 10.02% of patients at other facilities stay at least 60 days. The probability that these differences are due to random chance are each less than 1 in 100 million. This evidence indicates that Creative's length of stay is excessive and they are keeping patients an unnecessarily long number of days in their facility.

119.    Relator's statistical analysis is consistent with what it learned from former employees who worked at Creative's facilities. Notably, that the excessive length of stay was not due to medical necessity but due to Creative's desire to maximize revenue. In particular, one former therapy assistant recalled instances where patients were ready to be discharged and were

practically running down the hall, but instead Creative management regularly insisted the patients be kept two more weeks. Such practices enabled Creative to maximize the amount of revenue they received from each patient.

120.     Additionally, one former Administrator at a Creative facility stated that due to goals established by corporate management, facilities would seek to maximize Medicare Part A reimbursement by keeping patients for the full 100 days, even if it was not clinically appropriate. Thus, the statistical evidence confirms what the former Administrator stated, that Creative is maximizing revenue regardless of whether patients still need skilled services.

### B.  The Excessive Length of Stay is Systemic Across Creative Facilities and not Limited to a Few Facilities

121.     To consider whether the excessive length of stay is limited to a few facilities or a systemic issue, Relator also analyzed trends for individual Creative facilities and compared them to other individual SNFs. Figure 23 shows the average length of stay provided to patients at all facilities in the United States and is ordered from facilities with the shortest length of stay to the longest. As shown in the figure, the trend of excessive length of stay is prevalent across Creative facilities (presented in red). 42 Creative facilities (with at least 100 admissions) are in at least the 75th percentile of all facilities based on average length of stay. Out of more than 14,000 facilities with at least 100 Medicare admissions, Creative has 27 facilities in the top 2,000 facilities. It is difficult to overstate how impossible it would be for this scenario to exist due to random chance. The probability of Creative having 27 out of 47 facilities in the top 2,000 occurring randomly is less than 1 in 100 million,[48] meaning the behavior cannot be attributed to a few rogue facilities, but is instead systemic and consistent throughout the Creative system. This indicates that the

---

[48] This statistical probability is based on a uniform distribution. For example, since there are more than 14,000 SNFs, the top 2,000 facilities would be equivalent to the top 13.43% of facilities. Hence, we should only expect that 13.43% of Creative's 47 facilities, or only 6.3 of its facilities, should be among the top 2,000 facilities, as opposed to 27 Creative facilities, which we observe.

unreasonable and unnecessary length of stay at Creative is due to directives from the Creative system.

**Figure 23. Distribution of Average Length of stay by Individual SNF.**
The following figure shows, for every SNF that treated at least 100 patients, the average number of Ultra High Rehab treatment days across all patients in that facility. Creative facilities are highlighted in red. This graph comprises more than 14,000 SNFs.



| Creative Facility | Non-Creative Facility

## C. Patient Characteristics and Demographics do not Explain the Excessive Length of Stay at Creative

122.    Relator also considered whether the extra length of stay could be attributed to a variety of other factors, including patient characteristics such as age, gender, and race, county-level demographic factors such as unemployment rate, and patient health characteristics such as principal diagnosis code, secondary diagnosis codes, and whether the patient had surgery. To do this, Relator ran the fixed effect linear regression model discussed in Equation 1 on page 44. For this regression, Relator used the patient's total length of stay on an admission as the dependent variable to calculate Creative's precise impact on a patient's projected length of stay. This regression allowed Relator to isolate the impact that being treated at Creative would have on a patient's expected length of stay at an SNF. For example, Relator has found that, given two patients

with the same age and gender, from the same county, with the same principal and secondary diagnoses from their prior hospital inpatient stay, same surgery status, and hospital inpatient same length of stay, the Creative patient would have a length of stay that is on average 6.48 more days longer than the patient at a non-Creative facility.

123.   The results of the regression are shown in Table 6. The Creative coefficient for length of stay is 6.48. This means that after controlling for the characteristics included in Equation 1 on page 44 above, patients at Creative can be expected to be treated an extra 6.48 beyond the length of stay at other facilities. This result is highly statistically significant with the probability that this observed difference is due to random chance being less than 1 in 100 million. The regressions demonstrate that the length of stay at Creative is extremely outside of the norms of what is acceptable and reasonable in industry for patients with similar characteristics.

**Table 6. Results of Fixed Effect Linear Regression Model for Length of Stay**
Relator used a linear regression to analyze approximately 14 million admissions at Creative and other SNFs. The results are presented in the following table. The coefficient is listed first, and the p-value is in parenthesis, which represents the statistical significance of the coefficient. A lower p-value means the result is more statistically significant. Coefficients were not included for categorical variables and instead are labeled with a "Yes" to indicate the variable was controlled for in the regression. The Creative coefficient is added to the length of stay at other facilities to get the expected Creative length of stay after including controls.

| | **Regression Coefficients** |
| | *(See description in table header)* |
|---|---|
| Poverty Rate | 0.0026 |
| | (0.3267) |
| Unemployment Rate | -0.1586 |
| | (<0.0001) |
| Log Median Income | -0.5846 |
| | (<0.0001) |
| No High School Diploma Rate | 0.215 |
| | (<0.0001) |
| Season Control Variables | Yes |
| Age Control Variables | Yes |
| Sex Control Variables | Yes |
| Inpatient Length of Stay × Inpatient Principal Diagnosis Category | Yes |
| Inpatient Surgical DRG × Inpatient Principal Diagnosis Category | Yes |
| Inpatient Secondary Diagnosis Categories | Yes |
| RUCC Control | Yes |
| Creative Coefficient for Unexplained Length of Stay | 6.48 |
| | (<0.0001) |
| Other Facilities Average | 27.38 |
| **Creative Calculated Effect** | **33.86** |
| **Creative Relative Effect** | **123.67%** |

124.    Another regression method to estimate Creative's effect on length of stay is to estimate the regression without the skilled nursing chain variable and create an estimate of the expected length of stay for each individual claim. For each skilled nursing chain, the average difference between the predicted length of stay from the regression and the actual length of stay billed on the claim is calculated, which is referred to as a residual. The difference between these two values represents the unexplained length of stay that is caused by each skilled nursing chain. Figure 24 shows the average unexplained length of stay for each skilled nursing chain, with

Creative plotted in red. Creative's average unexplained length of stay by this measure is 6.41 days, making it the 18th highest among all skilled nursing chains with at least 5,000 admissions.

**Figure 24. Average Unexplained Length of Stay for SNF Chains.**
The following figure plots the results of the regression from Equation 1, but run without the Creative fixed effect variable and with the dependent variable of length of stay. All other variables included were the same. The regression was run based on 333 SNF chains with at least 5,000 patient admissions from 2012 through 2018. The small vertical lines off of the point estimates represent the confidence interval for the systems' unexplained Ultra High Rehab. Since chains with at least 5,000 admissions were included, the large number of admissions result in small confidence intervals.



125.    This evidence indicates that not only is Creative providing excessive Ultra High Rehab, but Creative is also keeping patients longer than necessary. These results are statistically significant at an extremely high level and cannot be explained by other patient and demographic characteristics.

## D.  Attending Physicians are not Responsible for the Excessive Length of Stay

126.    Relator also considered whether the extra length of stay could be caused by the preferences or treatment decisions of physicians who work with patients at Creative's facilities as

opposed to some system-wide decision or corporate directive. To address this, Relator analyzed the subset of claims for physicians who worked at both a Creative facility and other non-Creative facilities, to determine whether their patients receive statistically longer lengths of stay at Creative than at other non-Creative facilities. Across all admissions involving doctors that treat at least 11 patients at both Creative and other facilities, patients at Creative have an average length of stay of 36.52 days at Creative, whereas patients treated by the same doctors at non-Creative facilities have an average length of stay of only 30.88 days. This means that when the same doctor oversees patients at both Creative and non-Creative facilities, the patients at Creative have a length of stay that is 5.64 days longer on average, or 18.25 percent longer.

127.    Analyzing each common doctor individually further demonstrates how it is Creative, not doctors, that is responsible for excessive length of stay. As shown in Figure 25, out of 172 doctors who treated at least 11 patients at both Creative and other non-Creative facilities, 127 (73.8 percent) had higher average length of stay at Creative than at their other facilities. The probability that random chance explains these many doctors having patients with higher lengths of stay at Creative than among their patients at other facilities is less than 1 in 100 million.

**Figure 25. Attending Physician Average Length of Stay at Creative Versus Other Facilities.**
The following figures show the comparison of average length of stay associated with physicians who treated at least 11 patients at Creative and other facilities. Panel A plots one point for each attending physician and shows the average length of stay at Creative on the x-axis and at other facilities on the y-axis. The size of the dot corresponds to the number of patients the doctor treated at Creative. Panel B compares the distribution of the average length of stay for these doctors at Creative versus non-Creative facilities. The graphs are based on more than 18,000 patient admissions at Creative and approximately 88,000 patient admissions at other facilities for 172 common doctors.

*Panel A: Scatter Plot of Average Length of Stay by Attending Physician*



*Panel B: Distribution of Average Length of Stay by Attending Physician*



128.   Thus, the excessive length of stay provided to patients at Creative cannot be explained by the professional opinion or judgment of the attending physicians serving at Creative but is instead due to system-wide practices in place at Creative through corporate policies or directives.

### 5.   Economic Damages

129.   Relator employed a robust and conservative methodology to quantify the economic damages caused by Creative's fraudulently excessive Ultra High Rehab. Such analysis shows that the amount of Ultra High Rehab provided to patients is unnecessary and unreasonable, and in many cases, the patients did not need skilled nursing care for the entirety of their admission.

130.   Relator has limited this complaint to only the most extreme cases—*i.e.*, for inpatient diagnosis categories in which Creative billed for Ultra High Rehab at least two times the rate of other facilities or at least 6 more days on average. Additionally, only results that were statistically

significant at a rate of at least 1 in 1,000—or almost certainly not random—were considered fraudulent.

131.    To calculate damages, Relator compared Creative's average days of Ultra High Rehab to the average days of Ultra High Rehab at non-Creative facilities, then multiplied those excessive days of Ultra High Rehab by the additional revenue per day Creative received by billing for Ultra High Rehab. To determine this additional revenue per day that Creative received for Ultra High Rehab, Relator first calculated the average per diem rate at Creative for each rehab category as shown in Table 7.[49] The values in the table enable Relator to calculate the additional revenue Creative received for Ultra High Rehab relative to different levels of therapy, ranging from a high of $569.01 per day when compared to a patient who should have been discharged to a low of $89.39 per day when compared to a patient should have received Very High Rehab.[50]

**Table 7. Per-diem reimbursement by category**
The following table shows the weighted average reimbursement for each category of rehab, based on the 2012-2018 SNF reimbursement schedule. Payments were weighted based on Creative's distribution of claims among all of the RUGs.

| Category | Therapy Amount | Average Per Diem Rate |
|---|---|---|
| Ultra High Rehab | 720+ minutes per week | $569.01 |
| Very High Rehab | 500 – 720 minutes per week | $479.62 |
| High Rehab | 325 – 499 minutes per week | $414.28 |
| Medium Rehab | 150 – 324 minutes per week | $368.73 |
| Low Rehab | 45 – 150 minutes per week | $358.84 |
| No Rehab | Less than 45 minutes per week | $330.12 |

132.    Next, to determine the specific amount of therapy that would have been provided at Creative had it not fraudulently billed for excessive Ultra High Rehab, Relator calculated the average amounts of Very High Rehab, High Rehab, Medium Rehab, Low Rehab and No Rehab billed at non-Creative facilities for each day of stay, given a particular inpatient principal diagnosis.

---

[49] These amounts are calculated before any adjustments to Creative's payments based on geographic or other factors. As a result, this allowed Relator to calculate only the marginal revenue that is obtained by moving up to higher categories, independent of regional adjustments which Creative would get regardless.

[50] To calculate the additional revenue from Ultra High Rehab for a patient who should have received Very High Rehab, we take the difference between the average per diem rates for the two levels of therapy: $569.01 - $479.62 = $89.39.

Then, Relator reallocated Creative's excessive days of Ultra High Rehab to the lower therapy levels as determined by the average amounts at non-Creative facilities, starting with Very High Rehab and working down towards the lower categories of rehab until the remaining days represent days in which the patient should not have remained in the SNF. For the 41 principal diagnosis code categories in which Relator determined with statistical significance that Creative was excessively treating patients with a longer length of stay, Relator assigned any remaining days of Ultra High Rehab to excessive length of stay, meaning the patient should have been discharged. For the remaining principal diagnosis codes for which Creative does not provide a statistically significant excessive length of stay, Relator allocated all remaining days to the No Rehab category.

133.    Once the extra days have been allocated to the lower rehab categories, Relator used the average payment difference between Ultra High Rehab and the other categories from Table 7 to calculate the additional revenue obtained per patient per day due to the Ultra High Rehab. Relator then multiplied the additional revenue per patient day by the number of excessive days of Ultra High Rehab Creative provided, which yielded the total additional revenue Creative made per claim.

134.    Since a portion of the patient's stay beyond 20 days requires an average coinsurance payment of $156.43,[51] other payers would also be defrauded when the patient was kept in the SNF longer than when medically necessary. The coinsurance could be covered by another form of insurance, such as Medicaid, or paid directly by the individual beneficiary to the facility. Relator calculated the additional dollar value of the coinsurance Creative would have received on its false claims for unnecessary Ultra High Rehab provided after the 20th day of the benefit period. Relator removed these amounts from the damages calculated against Medicare.

---

[51] This represents the average coinsurance payment from 2012 through 2018.

135.    The total value of the fraud committed against Medicare totaled $94.97 million, representing $401.85 per patient per day among Creative's fraudulent claims. Creative also submitted false claims to Medicaid in an amount to be proven at trial, which arose from coinsurance payments on Creative's excessive rehabilitation that lasted longer than 20 days.[52] These damages will increase as long as Defendants' fraud is allowed to continue.[53]

136.    It should be noted that Relator's analysis is also conservative because it compares Creative to all other SNFs receiving Medicare reimbursements, which includes a number of SNFs that have already settled with the US Department of Justice for the same type of fraud Relator is alleging in this complaint.[54] Incidentally, these are facilities that the Relator's methodology also identified as engaging in fraudulent billing. Therefore, the existence of the fraudulent claims submitted by these systems, along with other potentially fraudulent claims from other systems, causes the Relator's calculation of the amount of fraud to understate the true amount of fraudulent reimbursement billed by Creative. Additionally, Relator only calculated damages from the excessive length of stay for the days in which the patient received Ultra High Rehab. Patients continue receiving rehab and other skilled nursing services during the excessive length of stay, and including these extra days in the damage calculation would increase the total damages. Nevertheless, the damage numbers are estimates and could change based on consideration of additional information.

---

[52]  If Creative's Medicare patients were dual enrolled in Medicaid at a similar rate to the county-level averages, then 10.72% of Creative's patients would be on Medicaid and 10.72% of copayments would be paid by Medicaid. This would total an additional $2.01 million in damages to Medicaid. If Creative had a higher proportion of Medicaid patients or its dual enrolled patients stayed longer than Medicare-only patients on average, then damages to Medicaid would increase. Relator used the *All County-Level Profiles* (2012 Data), which was produced by Medicare-Medicaid Coordination Office and is available at https://goo.gl/4tu6wh.

[53]  As noted previously, only claims for patients admitted prior to April 1, 2018 were analyzed by the Relator to allow for analysis of the patient's entire length of stay. Relator also analyzed the associated inpatient hospital claims data from CMS for the SNF patients.

[54]  For example, the comparison list of facilities includes claims filed by Life Care Centers of America Inc. and Kindred Healthcare Inc., which settled with the Department of Justice for $145 million and $125 million respectively over allegations that these organizations were providing excessive therapy to maximize reimbursement.

137. Relator's consideration of other possible explanations, such as claim characteristics, patient characteristics, and doctor practices, demonstrates that the excessive Ultra High Rehab practices were intentionally implemented by Creative across the facilities in their system. Additionally, the extremely high levels statistical significance of the analyses across a variety of comparative settings indicate a nearly impossible probability that the practices are due to random chance. Thus, Relator's damage estimate of $94.97 million for Creative's fraudulently excessive Ultra High Rehab is robust when controlling for a variety of factors.

## V.    CAUSE OF ACTION

### COUNT ONE

### Violation of the False Claims Act, 31 U.S.C. § 3729(a)

138. Relator repeats and realleges every allegation contained above as if fully set forth herein.

139. As described above, Defendant has submitted and/or caused its facilities to submit false or fraudulent claims to Medicare and Medicaid by falsifying information concerning the amount and duration of rehabilitation needed by and/or provided to patients.

140. Moreover, Defendant has failed to report and return overpayments from Medicare and Medicaid within the required time.

141. Defendant, by the conduct set forth herein, has violated:

   a. 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; and/or

   b. 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim; and

   c. 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, causing to be made or used, a false record or statement material to an obligation to pay or transit money

or property to the government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government.

142.     Defendant also conspired with Century, Reliant and its facilities to defraud the federal government in violation of 31 U.S.C. § 3729(a)(1)(C), by knowingly and systematically falsifying claims allowed or paid by the government.

143.     The United States has suffered and continues to suffer damages as a direct proximate result of Defendant's false or fraudulent claims.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for relief and judgment, as follows:

a.     Defendant pays an amount equal to three times the amount of damages the United States has suffered because of Defendant's actions, plus a civil penalty against Defendant of not less than $10,957 and not more than $21,563 for each violation of 31 U.S.C. § 3729;

b.     Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

c.     Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d); and

d.     Relator and the United States be granted all such other relief as the Court deems just and proper.

## VI.     JURY TRIAL DEMANDED

Relator hereby demands a trial by jury.

DATED: January 9, 2019                    Respectfully submitted,

                                          **REID COLLINS & TSAI LLP**


                                          */s/ P. Jason Collins*

                                          P. Jason Collins
                                          Jeremy H. Wells
                                          Scotty G. Arbuckle III
                                          1301 S. Capital of Texas Hwy., Suite C-300
                                          Austin, Texas 78746
                                          T: (512) 647-6100
                                          F: (512) 647-6129
                                          Email: jcollins@rctlegal.com
                                                 jwells@rctlegal.com
                                                 tarbuckle@rctlegal.com


                                          *Counsel for Relator Integra Med Analytics LLC*

# EXHIBIT A

| NPI Number | Entity Name | Short Name | Address | City | State | Zip |
|---|---|---|---|---|---|---|
| 1700228632 | AMARILLO II ENTERPRISES, LLC | Amarillo II | 6641 W AMARILLO BLVD | AMARILLO | TX | 79106 |
| 1942446133 | AMARILLO VI ENTERPRISES, LLC | Amarillo VI | 2611 W 46TH AVE | AMARILLO | TX | 79110 |
| 1346540267 | BALLINGER I ENTERPRISES LLC | Ballinger | 1800 N BROADWAY ST | BALLINGER | TX | 76821 |
| 1487992418 | BANDERA I ENTERPRISES, LLC | Bandera | 159 MONTAGUE AVE | BANDERA | TX | 78003 |
| 1871873398 | BEAUMONT I ENTERPRISES, LLC | Beaumont | 1175 DENTON DR | BEAUMONT | TX | 77707 |
| 1023443579 | BEXAR I ENTERPRISES, LLC | Bexar | 8306 HUEBNER RD | SAN ANTONIO | TX | 78240 |
| 1437567096 | BIG SPRING I ENTERPRISES, LLC | Big Spring | 3701 WASSON RD | BIG SPRING | TX | 79720 |
| 1740526557 | BORGER I ENTERPRISES, LLC | Borger | 900 COLLEGE AVE | BORGER | TX | 79007 |
| 1447571732 | BROWNWOOD II ENTERPRISES, LLC | Brownwood II | 2501 MORRIS SHEPPARD DR | BROWNWOOD | TX | 76801 |
| 1619298908 | BROWNWOOD III ENTERPRISES, LLC | Brownwood III | 200 COUNTY RD 616 | BROWNWOOD | TX | 76802 |
| 1205894185 | CREATIVE SOLUTIONS IN HEALTHCARE AT GRANBURY LLC | Granbury | 301 S PARK ST | GRANBURY | TX | 76048 |
| 1326343898 | DECATUR I ENTERPRISES LLC | Decatur | 201 E THOMPSON ST | DECATUR | TX | 76234 |
| 1184995037 | DEL RIO I ENTERPRISES, LLC | Del Rio | 711 KINGS WAY | DEL RIO | TX | 78840 |
| 1497072367 | DEVINE I ENTERPRISES, LLC | Devine | 104 ENTERPRISE AVE | DEVINE | TX | 78016 |
| 1669746210 | DUMAS I ENTERPRISES, LLC | Dumas | 315 E 19TH | DUMAS | TX | 79029 |
| 1225309172 | EAGLE PASS I ENTERPRISES, LLC | Eagle Pass | 2550 ZACATECAS DR | EAGLE PASS | TX | 78852 |
| 1447403118 | EDEN II ENTERPRISES, LLC | Eden | 613 EAKER ST | EDEN | TX | 76837 |
| 1386884047 | EL PASO I ENTERPRISES, LLC | El Paso I | 223 S RESLER | EL PASO | TX | 79912 |
| 1801036561 | EL PASO II ENTERPRISES, LLC | El Paso II | 9001 N LOOP | EL PASO | TX | 79907 |
| 1124061304 | FAIRFIELD I ENTERPRISES, LLC | Fairfield | 420 MOODY ST | FAIRFIELD | TX | 75840 |
| 1417130212 | FRANKLIN II ENTERPRISES, LLC | Franklin | 700 HEARNE ST | FRANKLIN | TX | 77856 |
| 1649317306 | GAINESVILLE I ENTERPRISES, LLC | Gainesville | 1900 O'NEAL ST | GAINESVILLE | TX | 76240 |
| 1114200805 | GLEN ROSE I ENTERPRISES, LLC | Glen Rose | 203 GIBBS BLVD | GLEN ROSE | TX | 76043 |
| 1689824526 | GROVETON I ENTERPRISES LLC | Groveton | 1020 W 1ST ST | GROVETON | TX | 75845 |
| 1871996363 | HEARNE I ENTERPRISES, LLC | Hearne | 611 ROSE MARIE BLVD | HEARNE | TX | 77859 |
| 1114985900 | JACKSONVILLE III ENTERPRISES, LLC | Jacksonville | 1123 N BOLTON ST | JACKSONVILLE | TX | 75766 |
| 1417275900 | KENEDY I ENTERPRISES, LLC | Kenedy | 7882 S HWY 181 (NO MAIL SERVICE) | KENEDY | TX | 78119 |
| 1437117272 | LONGVIEW I ENTERPRISES, LLC | Longview | 2711 PINE TREE RD | LONGVIEW | TX | 75604 |
| 1841563038 | LUBBOCK I ENTERPRISES, LLC | Lubbock I | 4320 W 19TH ST | LUBBOCK | TX | 79407 |
| 1881945335 | LUBBOCK II ENTERPRISES, LLC | Lubbock II | 5502 W 4TH ST | LUBBOCK | TX | 79416 |
| 1366863482 | LUBBOCK III ENTERPRISES, LLC | Lubbock III | 4120 22ND PL | LUBBOCK | TX | 79410 |
| 1578518924 | LUFKIN I ENTERPRISES, LLC | Lufkin | 2414 W FRANK AVE | LUFKIN | TX | 75904 |
| 1952584757 | MADISONVILLE II ENTERPRISES, LLC | Madisonville | 411 E COLLARD | MADISONVILLE | TX | 77864 |
| 1619113644 | MCLEAN I ENTERPRISES, LLC | Mclean | 605 W SEVENTH ST | MCLEAN | TX | 79057 |
| 1336385442 | MEMPHIS I ENTERPRISES, LLC | Memphis | 1415 N 18TH ST | MEMPHIS | TX | 79245 |
| 1821332586 | MINERAL WELLS I ENTERPRISES, LLC | Mineral Wells | 316 SW 25TH AVE | MINERAL WELLS | TX | 76067 |
| 1114196771 | NACOGDOCHES CSNHC ENTERPRISES, LLC | Nacogdoches | 227 RUSSELL BLVD | NACOGDOCHES | TX | 75965 |
| 1972640506 | PALESTINE I ENTERPRISES, LLC | Palestine | 2404 HWY 155 | PALESTINE | TX | 75803 |
| 1881974319 | ROSEBUD I ENTERPRISES, LLC | Rosebud | 407 N COLLEGE ST | ROSEBUD | TX | 76570 |
| 1275916090 | RUSK I ENTERPRISES, LLC | Rusk | 1884 LOOP 343 WEST | RUSK | TX | 75785 |
| 1982912283 | SCHERTZ I ENTERPRISES, LLC | Schertz | 930 ROY RICHARD DR | SCHERTZ | TX | 78154 |
| 1356587463 | SLATON I ENTERPRISES, LLC | Slaton | 630 S 19TH | SLATON | TX | 79364 |
| 1508903451 | TYLER II ENTERPRISES, LLC | Tyler | 3526 W ERWIN ST | TYLER | TX | 75702 |
| 1447483631 | VIDOR I ENTERPRISES, LLC | Vidor | 470 MOORE DR | VIDOR | TX | 77662 |
| 1487890596 | WELLINGTON I ENTERPRISES, LLC | Wellington | 1506 CHILDRESS ST | WELLINGTON | TX | 79095 |
| 1871551622 | WOODVILLE II ENTERPRISES, LLC | Woodville | 647 US HWY 190 W | WOODVILLE | TX | 75979 |
| 1285182600 | EAGLE PASS II ENTERPRISES, LLC | Eagle Pass II | 3333 BOB ROGERS DR | EAGLE PASS | TX | 78852 |
| 1215483037 | MEXIA II ENTERPRISES, LLC | Mexia II | 501 E SUMPTER ST | MEXIA | TX | 76667 |