# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* INTEGRA MED ANALYTICS, LLC, | § § § | |
| *Plaintiff,* | § § | Civil Action No.  SA-17-CV-1249-XR |
| v. | § § § | |
| CREATIVE SOLUTIONS IN HEALTHCARE, INC., | § § § | |
| *Defendant.* | § § | |

## ORDER ON MOTION TO DISMISS

On this date, the Court considered Defendant's Motion to Dismiss Relator's First Amended Complaint (docket no. 35), Relator's Opposition (docket no. 42), Defendant's Reply (docket no. 47), both parties' oral arguments on August 22, 2019 (docket no. 52), and both parties' supplemental briefings in further support and opposition (docket nos. 53 and 54). After careful consideration, Defendant's Motion is DENIED IN PART and GRANTED IN PART.

## BACKGROUND

Integra Med Analytics, LLC ("Relator") brings this *qui tam* action against Creative Solutions in Healthcare, Inc. ("Defendant"), alleging violations under the False Claims Act ("FCA"). Specifically, Relator asserts violations of 31 U.S.C. § 3729(a)(1)(A)-(C) and (G). Defendant owns[1] and operates a network of skilled nursing facilities ("SNFs") throughout Texas.

---

[1] In its motion to dismiss, Defendant argues there is no basis for a claim against Creative because Creative allegedly does not own the facilities at issue in the suit. Docket no. 35 at 12. But Relator's claims are based not on ownership but rather on the allegation that Defendant *caused* false claims to be submitted. 31 U.S.C. § 3729(a)(1)(A) (liability for a party who "knowingly presents, *or causes to be presented*," a false or fraudulent claim…) (emphasis added); *see also United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 378 (5th Cir. 2004) ("[A defendant] need not be the one who actually submitted the claim

Docket no. 17 at 4. Relator, through both quantitative and qualitative analysis, alleges that Defendant and its rehab contractors, Century Rehab ("Century") and Reliant Rehabilitation ("Reliant")[2], engaged in various practices resulting in the submission of over $94 million in false claims to Medicare, as well as approximately $2.01 million in false claims to Medicaid from coinsurance for Medicare patients dual enrolled in Medicaid.

Medicare covers post-hospitalization services provided in SNFs for up to 100 days per year, reimbursing SNFs at a per-diem rate based on one of sixty-six resource utilization groups ("RUGs") that are determined by the amount of therapy and other services provided to patients. Docket no. 17 at 9. The highest category, Ultra High Rehab, is for patients receiving more than 720 minutes of rehab in a week. Docket no. 17 at 9.

Relator contends that Defendant engaged in a scheme to manipulate Medicare reimbursement through a variety of measures, three of which Relator alleges at detail. First, Relator alleges leadership pressured therapists to use Ultra High Rehab regardless of need. Docket no. 17 at 11-16. Relator argues this manifested in multiple ways, including prescribing therapy based on patient insurance rather than need and the provision of therapy to patients without the mental or physical capacity to tolerate it. *Id.* As an example, one former Director of Rehab at a Creative facility alleges he was *ex ante* dictated therapy to assign and told afterwards to create a justification for the provision of Ultra High Rehab. *Id.* at 15. In fact, Relator alleges, Defendant required justification for patients who did *not* receive Ultra High Rehab. *Id.*

---

forms in order to be liable."). And in any event, at oral argument, Defendant conceded ownership for purposes of this motion. Docket no. 52 at 4.

[2] In addition to its argument that Defendant does not own the facilities, *see supra* note 1, Defendant also argues that it does not submit claims to Medicare and thus cannot be held liable. But that misconstrues Relator's theory of liability which does not rely upon Defendant having submitted the claims itself. *See Riley*, 355 F.3d at 378.

Second, Relator alleges that management trained therapists at Creative-managed facilities to fraudulently bill to meet the minimum threshold for Ultra High Rehab. *Id.* at 16-18. Relator claims this manifested in many ways, including: billing Ultra High Rehab for patients who were unconscious or otherwise unable to participate in therapy; falsifying therapy evaluations, including back-dating evaluations to allow for more possible billing time (and when the therapist refused to do so, bringing in another who would); billing group therapy as the more expensive individual therapy; encouraging therapists to bill for otherwise non-reimbursable non-skilled services[3]; billing for more therapy than was actually provided; and billing for therapy minutes during an evaluation session.[4] *Id.* at 16-18.

Relator's third set of allegations centers around Defendant's alleged policy of maximizing a patient's stay to the 100 days covered by Medicare Part A—even where not clinically warranted—to maximize reimbursement. *Id.* at 18-19. One therapist assistant alleges being ordered to provide therapy for the full 100 days even where not warranted and being asked "to be creative" to find ways to fill those 100 days, e.g. finding non-skilled, non-therapy tasks to fill the 100 days, despite Medicare regulations stating that such routine non-skilled services are not reimbursable. *Id.*

To support those three sets of allegations, Relator conducted various statistical and econometric analyses, focusing on identifying excessive amounts of Ultra High Rehab at Creative-owned facilities compared to other SNFs. *Id.* at 19-96. Relator created 589 groupings (or "bins") of similar principal diagnosis codes, using a fixed-effect linear regression model. *Id.* at 21-22.

---

[3] Relator also alleges a former Director of Rehab "got in trouble" for reporting to management that another therapist was billing for such unskilled therapy. Docket no. 17 at 17.

[4] One physical therapist recalled being instructed to bill 15 minutes for an evaluation (even though the evaluation required 45 minutes), with the rest being charged as the more expensive therapy. Docket no. 17 at 17.

Relator alleges its statistics reveal excessive use of Ultra High Rehab across Creative facilities, rather than limited to a few outlier facilities. *Id.* at 30. In its analysis, Relator points to specific patients whose claims, Relator argues, show that Creative billed for medically unreasonable and unnecessary treatment. *Id.* at 32-39.

Relator made attempts to rule out alternative hypotheses for the excessive use of Ultra High Rehab. *Id.* at 45. Relator's fixed-effect linear regression model, it alleges, controls for possible explanations including variations in patient health, patient characteristics, and county demographics. *Id.* at 46-52. Relator used a Comparative Interrupted Time Series (CITS) model to analyze Creative's acquisition of new SNFs to determine whether there was an increase in the amount of Ultra High Rehab provided after Creative gained ownership and control, finding a "significant jump" in the amount of Ultra High Rehab for patients treated before and after Creative's acquisition of the SNF. *Id.* at 52-66. Relator also alleges its statistics reveal there is not something unique about the diagnoses of Creative patients that explains the excessive use of treatment, as the analysis compares the use of therapy within the same diagnostic codes. *Id.* at 66-67. For example, for patients diagnosed with hip fractures, Creative provides an average of 34.82 days of Ultra High Rehab while other facilities provide an average of 21.57 days. *Id.* at 66. Finally, Relator alleges its analysis rules out the argument that the statistical difference is caused by either the attending or referring physicians. *Id.* at 68-77.

Relator further alleges that its statistics reveal Creative's large proportion of patients receiving exactly 100 days of Ultra High Rehab demonstrates Creative's attempts to maximize Medicare reimbursements. *Id.* at 39. Specifically, Relator alleges that Creative has more than 7.8 times as many patients receiving exactly 100 days of Ultra High Rehab as compared to other SNF facilities and that the probability of this difference being due to random chance is less than 1 in

100 million. *Id.* at 40. And Relator alleges that patients within principal diagnosis codes still receive a significantly higher average length of stay compared to other patients with the same diagnoses at other SNFs, ruling out the possibility that Creative simply has sicker patients. *Id.* at 78- 85. Relator also compared the average length of stay at Creative and non-Creative SNFs for the same doctor, finding the average length of stay longer for Creative patients, and thus—Relator argues—ruling out the possibility that Creative doctors' particular preferences caused the lengthier stays. *Id.* at 89-92.

Relator also alleges that Defendant conspired with Century, Reliant, and its facilities to defraud the federal government in violation of 31 U.S.C. § 3729(a)(1)(C)—by knowingly and systematically falsifying claims allowed or paid by the government. *Id.* at 97. Finally, Relator alleges that Defendant violated § 3729(a)(1)(G) by concealing Medicare overpayments. *Id.* at 96- 97. Relator filed this action on December 11, 2017. Docket no. 1. On December 12, 2018, the United States indicated its decision not to intervene. Docket no. 11.

## DISCUSSION

Defendant raises three primary arguments in support of its motion to dismiss. First, Defendant argues Relator's claims fail under Rules 12(b)(6) and 9(b). Second, Defendant argues the action is barred by the public disclosure bar. Finally, Defendant argues that Relator's conspiracy and "reverse FCA" claims fail as derivative of inadequate FCA allegations and because Relator does not allege the required specific intent necessary for conspiracy.

## I.    Pleading an FCA Violation under Rules 12(b)(6) and 9(b)

Defendant argues that Relator's First Amended Complaint fails under Rules 12(b)(6) and 9(b) in that it does not adequately plead that Defendant knowingly submitted false claims or adequately plead the "who, what, when, where, and how of the alleged fraud." Docket no. 54 at 3.

Relator responds that it alleges sufficient details of the scheme "paired with reliable indicia" in the form of statistical analysis, such that the evidence leads to a strong inference that Defendant submitted false claims.

### a. Legal Standard

To survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim for relief must contain: (1) "a short and plain statement of the grounds for the court's jurisdiction"; (2) "a short and plain statement of the claim showing that the pleader is entitled to the relief"; and (3) "a demand for the relief sought." FED. R. CIV. P. 8(a). In considering a motion to dismiss under Rule 12(b)(6), all factual allegations from the complaint should be taken as true, and the facts are to be construed favorably to the plaintiff. *Fernandez-Montes v. Allied Pilots Assoc.*, 987 F.2d 278, 284 (5th Cir. 1993). To survive a 12(b)(6) motion, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

In addition, "a complaint filed under the False Claims Act must meet the heightened pleading standard of Rule 9(b)." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185-86 (5th Cir. 2009) ("Rule 9(b) supplements but does not supplant Rule 8(a)'s notice pleading."). That rule provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," although the rule permits "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally." FED. R. CIV. P. 9(b). The rule acts "as a gatekeeper to discovery, a tool to weed out meritless fraud claims sooner rather than later." *Grubbs*, 565 F.3d at 185. The Fifth Circuit has given the rule a "flexible"

interpretation in the FCA context to help "achieve [the FCA's] remedial purpose." *Id.* at 190. A complaint can survive by either alleging "the details of an actually submitted false claim" or by "alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.*

### b. Analysis

The FCA authorizes actions by the United States or by a relator in a *qui tam* capacity on behalf of the government. 31 U.S.C. § 3730(a)-(b). Through those actions, the FCA imposes civil penalties and treble damages on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the federal government. *Id.* § 3729(a)(1)(A) ("presentment claim"). It imposes the same liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* § 3729(a)(1)(B) ("false statement claim"). The FCA also imposes liability on persons who conspire to commit a violation of either (A) or (B). *Id.* § 3729(a)(1)(C).

The Fifth Circuit has summarized the FCA inquiry as: "(1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e. that involved a claim)." *United States ex rel. Harman v. Trinity Inds. Inc.*, 872 F.3d 645, 653-54 (5th Cir. 2017) (quoting *United States ex rel. Longhi v. Lithium Power Tech., Inc.*, 575 F.3d 458, 467 (5th Cir. 2009)). The Court will consider each element in turn.

#### i. *False statement or fraudulent course of conduct*

A claim is false when it is "grounded in fraud which might result in financial loss to the government." *Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir. 1975). Given the remedial nature of the FCA and the lack of a reliance and damages requirement, the Fifth Circuit has relaxed Rule

9(b) when considering such a claim. *Grubbs*, 565 F.3d at 189. In pleading the falsity or fraudulence of a claim, a plaintiff need not provide the "exact dollar amounts, billing numbers, or dates," as such a requirement would be "one small step shy of requiring production of actual documentation with the complaint…, significantly more than any federal pleading rule contemplated." *Id.* at 190. The rule requires only simple, concise, and direct circumstances constituting fraud which, when taken as true, must make relief plausible, not merely conceivable. *Id.* at 185-86.

Here, Relator alleges particular details of a scheme—through its witness interviews—which, when paired with the "reliable indicia" of its expansive statistical analysis, lead to a "strong inference" that false claims were actually submitted. *Id.* at 190. Though some of Relator's examples are consistent with non-fraudulent business practices and, as such, do not pass the plausibility test,[5] Relator provides other examples which, if true (which the Court must assume at this stage), make relief plausible. By way of example, a physical therapist at Fairfield "recalled being instructed to allot 15 minutes for evaluation, even though it required 45 minutes, with the rest of the evaluation session charged at therapy rates." Docket no. 17 at 17. Or the therapist at Brownwood II who was asked to fabricate evaluations to justify the past provision of therapy, being required to back-date evaluations to allow for more time to be billed. *Id.* at 18. Finally, a therapist at Lubbock II received pressure from management "to provide Ultra High Rehab without any attention to the patients' plan of care." *Id.* at 14.

---

[5] For example, ranking facilities by profit and offering raises to facility administrators who increased Medicare revenue is just as consistent with an efficient business model as it is with fraud. And providing therapy to patients up until their death is just as consistent with palliative end-of-life care as it is with fraud. *See United States ex rel. Integra Med Analytics, LLC v. Baylor Scott & White et al.*, No. 5:17-CV-886-DAE, 2019 WL 3713756, at *4 (W.D. Tex. Aug. 5, 2019) ("[S]uch a scheme is not in and of itself one to submit false claims and is equally consistent with a scheme to improve hospital revenue through accurate coding….").

Relator's use of statistics lies at the heart of Defendant's motion. Defendant cites to cases finding the use of statistics to be insufficient for an FCA claim in that such statistics do not establish falsity—or the lack of medical necessity underlying a claim of falsity. *See, e.g., United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (finding that relator's reliance on statistics amounted to mere speculation, failing to satisfy Rule 9(b)). But *Thompson* rejected the relator's claim because its argument was based entirely on statistics. *Id.* ("[Relator] provided no factual basis for his belief that defendants submitted claims for medically unnecessary services other than his reference to statistical studies. There is no indication, however, that these studies directly implicate defendants."). Such is not the case here, where Relator has presented numerous witness interviews that support its statistical studies and where, in contrast to *Thompson*, those statistical studies do directly implicate Defendant.

Defendant next cites to a case out of this district which granted a similar motion to dismiss. *See Baylor*, 2019 WL 3713756, at *6. Defendant argues that case establishes statistics cannot establish falsity because that court reasoned "[t]hat [d]efendants provided a certain treatment at rates higher than average, even significantly higher than average, is not *by itself* indicative of fraud or unnecessary treatment." *Id.* at *6 (emphasis added). Again, the crucial distinction is that, here, Relator does not rely on statistics alone but rather supports those statistics with its interviews with former employees. Defendant raises the recent *Providence* case for the same proposition but that case, too, found that "statistics *alone* are likely not enough to state a viable fraud claim." *United States ex rel. Integra Med Analytics, LLC v. Providence Health and Servs.*, No. CV-17-1694, 2019 WL 3282619, at *17 (C.D. Cal. July 16, 2019) (emphasis added).[6] Defendant protests that

---

[6] Defendant also points the Court to *United States ex rel. Nathan v. Takeda Pharm., N. Am., Inc.*, 707 F.3d 451 (4th Cir. 2013). But in that case, the Fourth Circuit considered—and declined to follow—the more relaxed construction of Rule 9(b) as authorized by the Fifth Circuit in *Grubbs*. *Id.* at 457-58.

Relator's original complaint contained no such interviews to support its statistical analysis—perhaps surmising that Relator forecast the dismissals in *Baylor* and *Providence* and adjusted accordingly—but Defendant's motion to dismiss is a motion to dismiss the *First Amended Complaint* and, as such, the Court must look at the contents of that amended complaint which contain more than "statistics alone." In sum, the statistics in this case form the "reliable indicia" that, when paired with the witness interviews, lead to a "strong inference" that Defendant submitted false claims. *Grubbs*, 565 F.3d at 190.[7] Defendant's arguments as to the appropriate weight of the statistics are better suited for a fact finder. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 565 (1985).

In terms of falsity, Defendant's second line of argument is that "medical necessity" is not a sufficient ground for an FCA claim and that such a dispute is a dispute over medical judgment and not a false claim. Docket no. 35 at 19 (citing *Riley* 355 F.3d at 376) ("A lie is actionable but not an error")). But in *Riley*, the Fifth Circuit agreed with the district court that "claims for medically unnecessary treatment are actionable under the FCA." *Riley*, 355 F.3d at 376. *Riley* does hold that expressions of opinions or scientific judgments about which reasonable minds may differ cannot be false, but Relator's claims here are not based on expressions of opinions or scientific judgments but rather are based on allegations of knowingly fraudulent conduct. It would be an nonactionable disagreement of opinion if a relator alleged that a physician arguably should have treated a patient with X but instead chose Y based on the physician's opinion or judgment. But it

---

[7] *See also In re Chevron U.S.A. Inc.*, 109 F.3d 1016, 1020 (5th Cir. 1997) ("The applicability of inferential statistics have long been recognized by the courts."); *United States v. Life Care Ctrs. of Am., Inc.*, 114 F. Supp. 3d 549, 570-71 (E.D. Tenn. 2014) ("The Court has reviewed the language and legislative history of the FCA as well as the relevant case law and concludes that the sue of statistical sampling…is a legally viable mechanism which the Government may employ in attempting to prove the FCA claims in this action. The purpose of the FCA as well as the development and expansion of government programs as to which it may be employed support the use of statistical sampling in complex FCA actions where a claim-by-claim review is impracticable.").

is different—and actionable—to allege a physician knew a patient should be treated for X and nonetheless treated him for Y so as to maximize Medicare reimbursement. Relator alleges the latter.

Defendant claims "the only court in this circuit to hear an FCA case based on medical necessity rejected the theory…." Docket no. 35 at 19 (citing *United States ex rel. Wall v. Vista Hospice Care, Inc.*, No. 3:07-cv-604, 2016 WL 3449833 (N.D. Tex. June 20, 2016)). However, that court held the relator did not have sufficient evidence at the *summary judgment* stage to pass the falsity hurdle; indeed, the court wrote "Although Relator's contention of a scheme and anecdotal evidence were *sufficient to survive a motion to dismiss*, without evidence that such practices led to false certifications or claims, Relator cannot prevail on summary judgment." *Id.* at *19 (emphasis added). Defendant, therefore, may be correct that Relator's evidence of a lack of medical necessity is insufficient to prove falsity, but such a determination is better suited for summary judgment—not a motion to dismiss. In fact, in that case, an earlier motion to dismiss was denied, in part, under the *Grubbs* standard that this Court uses today. *See United States ex rel. Wall v. Vista Hospice Care, Inc.*, No. 3:07-CV-604, 2012 WL 12886423, at *5 (N.D. Tex. July 23, 2012) ("[Relator] satisfies her pleading obligations, by alleging that [defendant] had a practice of certifying patients with a reckless disregard for their actual condition.").

ii. *Scienter*

The FCA further requires that the defendant have acted "knowingly," meaning the person had actual knowledge, acted in deliberate ignorance of the truth or falsity of the information, or acted in reckless disregard of the truth or falsity. Specific intent is not required. 31 U.S.C. § 3729(b)(1)(A)-(B); *see also* FED. R. CIV. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). In other words, a relator need not show that the

defendant was aware of the truth, if the defendant acted with reckless disregard for the truth. *United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 259-61 (5th Cir. 2014). Consistent with the purpose of the FCA, negligent or innocent actions do not satisfy the knowledge element, *Hindo v. Univ. of Health Sciences/The Chi. Med. Sch.*, 65 F.3d 608, 613 (7th Cir. 1995), and in interpreting the knowledge element, the court must deter fraud but not punish those who accidentally submitted an incorrect claim. *See United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1274 (D.C. Cir. 2010).

Here, Defendant claims that Relator's only reference to the scienter requirement is a recital of the language of the FCA. Docket no. 25 at 20. Defendant argues that, though Rule 9(b) does not require particularized allegations of scienter, conclusory recitals of a cause of action's elements "do not have to be accepted as true." *Id.* (citing *Iqbal*, 556 U.S. at 678). But given Rule 9(b)'s lowered scienter requirement and the inferences this Court must draw at this stage, the Court finds that Relator has pleaded sufficient facts to, at minimum, show that Defendant acted in reckless disregard as to the truth or falsity of its Medicare claims. Accepting Relator's allegations as true, managers at Defendant-owned facilities would get "pissed off" when Ultra High Rehab was not assigned and would pressure therapists to provide such rehab, without any attention to the patients' needs. Docket no. 17 at 14. One director reported having to send in a report every week to management with a justification for every patient *not* receiving Ultra High Rehab. *Id.* at 15. Another therapist recalled Defendant's administrators insisting on keeping patients for two more weeks even though the patients were "running down the halls." *Id.* At another facility, management allowed therapists to bill group therapy as individual therapy, as well as "encourag[ing] or knowingly allow[ing] therapists to bill for non-skilled services." *Id.* at 17. Given that the evidence

points toward actual knowledge, a higher standard than what the FCA requires for scienter, the Court finds Relator has plausibly pled the scienter element.

iii.    *Materiality*

The FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The plaintiff must show that the defendant's allegedly false statements could have influenced the government's payment decision or had the potential to do so, not that the false statements must have actually done so. *Longhi*, 575 F.3d at 467 ("All that is required under the test for materiality, therefore, is that the false of fraudulent statements have the potential to influence the government's decisions."). An FCA materiality inquiry "looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016).

The Supreme Court recently elaborated on the factors that lower courts should consider in determining materiality under the FCA. *United States ex rel. Lemon v. Nurses to Go, Inc.*, 924 F.3d 155, 159 (5th Cir. 2019) (citing *Escobar*, 136 S. Ct. at 2003). The *Escobar* Court instructs courts to consider whether: "(1) the alleged violations are conditions of payment;" (2) "the Government would deny [d]efendants reimbursements payments if it had known of these alleged violations;" and (3) noncompliance is minor or substantial. *Escobar*, 136 S. Ct. at 2003. No one factor is dispositive, and the analysis is holistic. *Lemon*, 924 F.3d at 161.

Relator has met this burden. First, the alleged violations are indeed conditions of payment, as Medicare does not reimburse services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury…." 42 U.S.C. § 1395y(a)(1)(A). And a physician, nurse practitioner, clinical nurse specialist, or physician assistant must certify that: (1) services are

required because the person needs skilled nursing care or other skilled rehabilitation services on a daily basis; (2) services "can only be provided in a skilled nursing facility on an inpatient basis;" and (3) services are provided to address the condition for which the patient was receiving care for when he or she was an inpatient. *Id.* § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b). Given those statutory requirements, the Court is "satisfied that [Relator] raise[s] a reasonable inference that the Government would deny payment if it knew about Defendant's alleged violations." *Lemon*, 924 F.3d at 162.

Nor is there reason to believe that Medicare would reimburse Defendants for unnecessary services at such SNFs, particularly where Ultra High Rehab, the service at issue here, is the most expensive and intensive therapy provided at SNFs and where the claims Relator alleges total more than $94 million. *Id.* at 163. It thus cannot be said that noncompliance was "minor or insubstantial," as this is a far cry from where a claimant falsely certifies compliance with a requirement that contractors buy American-made staplers. *Escobar*, 136 S. Ct. at 2003-4. *See also* Press Release, U.S. Dep't of Justice, *"Life Care Centers of America, Inc. Agrees to Pay $145 Million to Resolve False Claims Act Allegations Relating to the Provision of Medically Unnecessary Rehabilitation Therapy Services,"* (Oct. 24, 2016). The settlement in that case arose out of the defendant's alleged unnecessary use of Ultra High Rehab, irrespective of the clinical needs of the patient—much the same as the allegations in this case. The HHS Inspector General wrote, "Therapy provided in skilled nursing facilities must be medically reasonable and necessary, and we will continue to vigorously investigate companies that subject their residents to needless and unreasonable therapy."

iv. *Submission of a claim*

Finally, a plaintiff must prove that the false statement or conduct "caused the government to pay out money or to forfeit moneys due (i.e. that involved a claim)." *Harman*, 872 F.3d at 653-54. Defendant claims Relator has not provided "particular and reliable indicia that false bills were actually submitted as a result of the scheme – such as dates that services were fraudulently provided or recorded, by who, and evidence of the department's standard billing procedure." Docket no. 35 at 20 (citing *Grubbs*, 565 F.3d at 188). But in *Grubbs*, the Fifth Circuit was referencing proof that a *qui tam* plaintiff may introduce *at trial* and, in any event, the court then explained that "[f]raudulent presentment requires proof only of the claim's falsity, not of its exact contents" and that "a plaintiff does not necessarily need the exact dollar amounts, billing numbers, or dates to prove to a preponderance that fraudulent bills were actually submitted." *Grubbs*, 565 F.3d at 190.

To require that level of detail at this stage is "one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates." *Id.* at 189-90. Further specificity will often arise through discovery. *Id.* at 189; *see also United States ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 372 (5th Cir. 2017) ("The details of particular claims submitted to the government may only be attainable for relators through discovery, which a dismissal on the pleadings forestalls altogether.").[8]

Requiring Relator, at this stage, to provide billing numbers or the date in which a service was provided would be "one small step shy" of requiring Relator to produce actual documentation with the complaint. *Grubbs*, 565 F.3d. at 189-90. And in any event, Relator has provided a list of fifty-five allegedly fraudulent claims that were submitted to CMS which, when paired with the

---

[8] *See also Grubbs*, 565 F.3d at 190 ("In many cases, the defendants will be in possession of the most relevant records, such as patients' charts, doctors' notes, and internal billing records….").

statistical analyses, serve as reliable indicia that Defendant indeed presented such claims. Docket no. 42 at 32-39. Relator may have not yet "had any interaction with Creative residents or viewed any of their medical charts," as Defendant argues, but requiring Relator to have done so at this stage—without the benefit of any discovery—would be "significantly more than any federal pleading rule contemplates." *Grubbs*, 565 F.3d at 190; *see also United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 257 (3d Cir. 2016) (finding a relator's statistical analysis of defendant's goods on eBay, paired with a list of public shipments, was sufficient at the motion to dismiss stage despite not alleging "which shipments, during which time periods, at which ports, were supposedly unlawful").

## II.    The FCA's Public Disclosure Bar

Defendant next argues Relator is barred by the FCA's public disclosure bar because the underlying CMS data is a publicly-disclosed "federal report," because Relator's allegations are substantially the same as the CMS data, because Relator is not an original source, and because Relator's knowledge does not materially add to the public disclosures. Relator responds that the HIPAA-protected CMS data is non-public, that the data is not substantially the same as the scheme alleged in the Complaint, that Relator is an original source of the information, and that Relator voluntarily disclosed the alleged fraud to the government before filing.

The public disclosure bar, which applies whenever *qui tam* relators bring a suit based on publicly available information, has three primary considerations: (1) whether there has been a "public disclosure" of allegations or transactions, (2) whether the action is substantially similar to or "based upon" such publicly disclosed allegations, and (3) if so, whether the relator is the "original source" of the information. *Colquitt*, 858 F.3d at 373; *see also Stennett v. Premier Rehabilitation, LLC*, 479 F. App'x 631, 634-35 (5th Cir. 2012).

As an initial matter, the Court must clarify the relevant complaint for purposes of the public disclosure rule. Prior to the passage of the Patient Protection and Affordable Care Act ("PPACA"), challenges based on the FCA's public disclosure bar were considered jurisdictional and thus brought under Rule 12(b)(1). *See, e.g. Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 467 (2007). But after the passage of the PPACA, courts no longer consider the public disclosure rule as a jurisdictional bar. *Abbot v. BP Expl. & Prod. Inc.*, 851 F.3d 384, 387 (5th Cir. 2017) ("We agree with our sister circuits that the public disclosure bar is no longer jurisdictional.").

As such, the Court finds unpersuasive prior cases forbidding courts from considering an amended complaint, as those cases based that on the public disclosure bar as being a jurisdictional rule. *See, e.g. United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 328 (5th Cir. 2011) ("[W]e fall back on the longstanding rule that the amendment process cannot be used to create jurisdiction retroactively where it did not previously exist."); *see also United States ex rel. Spicer v. Westbrook*, 751 F.3d 354, 365-55 (5th Cir. 2014) (affirming district court's consideration—and dismissal—of relator's amended complaint). Accordingly, the Court here considers Relator's amended complaint in its analysis of the public disclosure bar's three elements.

### A. Public Disclosure

A public disclosure occurs when the allegations or transactions are disclosed in "a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;" "in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation;" or by the "news media." 31 U.S.C. § 3730(e)(4)(A). The "key for determining whether allegations or transactions have been publicly disclosed is whether 'the critical elements of the fraudulent transaction were in the public domain.'" *United States ex rel. Colquitt v. Abbott Labs.*, 864 F. Supp. 2d 499, 519 (N.D. Tex. 2012) (quoting *United States ex rel. Springfield*

*Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994)). The "critical elements" have been sufficiently disclosed if the disclosure, taken together, would enable the government to draw an inference of fraud. *Id.*

The Fifth Circuit uses the *Springfield* test to determine whether the previous disclosures contain sufficient indicia to enable the government to draw such an inference of fraud such that the public disclosure bar applies. *United States ex rel. Solomon v. Lockheed Martin Corp.*, 878 F.3d 139, 144 (5th Cir. 2017) (citing *Springfield*, 14 F.3d at 654). Under this approach, to establish a previous public disclosure, "the combination of X and Y must be revealed, from which the readers or listeners may infer Z." *Colquitt*, 858 F.3d at 374. Z is an inference of fraud, and X and Y are "a misrepresented state of facts and a true state of facts." *Springfield*, 14 F.3d at 655. "The presence of one or the other in the public domain, but not both, cannot be expected to set government investigators on the trail of fraud." *Id.* In other words, if only one of the elements was previously disclosed (X *or* Y), then there has not been a public disclosure and a relator may come forward with the remaining element. *Id.*

Here, only one of the elements—the misrepresented state of facts—is public, allowing Relator to "mount a case by coming forward with either the additional elements necessary to state a cause of fraud (e.g. Y) or allegations of fraud itself (e.g. Z)." *Id.* Relator has done so with its interviews with former employees, as those employees provided the previously missing element— the allegedly "true state of facts." One could not have produced the substance of the First Amended Complaint from the CMS data alone because the mere knowledge that there are *claims* against the government does not lend itself "set government investigators on the trail of fraud" without more.

*Id.*[9] Indeed, Relator "bridged the gap by its own efforts and experiences…and completed the equation with information independent of any preexisting public disclosure." *Id.* at 657.

## B. Substantially the Same

Even if the relevant information were "publicly disclosed," the bar applies only to disclosures of "substantially the same allegations or transactions as alleged in the action." 31 U.S.C. § 3730(e)(4)(A). Prior to the PPACA's passage, the statute required the disclosures to be "based upon" publicly disclosed information, but the inquiry remains the same under the post-amendment language. *See Stennett*, 479 F. App'x at 634-35 ("The claims alleged in a *qui tam* suit are deemed 'based upon' the publicly disclosed allegations when both sets of allegations are substantially similar"); *see also United States ex rel. Hendrickson v. Bank of Am., N.A.*, 343 F. Supp. 3d 610, 623-24 (N.D. Tex. 2018) ("This change has no real impact, as courts considering the term 'based upon' interpreted it to mean 'substantially the same.'").

A complaint is "substantially the same as" or "based upon" public disclosures if "one could have produced the substance of the complaint merely by synthesizing the public disclosures' description of the…scheme." *Jamison*, 649 F.3d at 331. In so determining, "it is crucial to consider whether the disclosures correspond in scope and breadth." *Little v. Shell Expl. & Prod. Co.*, 690 F.3d 282, 293 (5th Cir. 2012). And in doing so, courts utilize the *Springfield* test as described above.[10]

---

[9] If the CMS data alone were to constitute a public disclosure, without more, then Defendant's submission of CMS data itself would effectively shield Defendant from FCA liability through the public disclosure bar, and "[t]his clearly cannot be the correct result.". *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 183 (E.D. Pa. 2012) (referring to CMS data reports as the "antithesis of publicly available information found to trigger the public disclosure bar").

[10] Indeed, courts often combine the first two steps, as doing so allows the scope of the relator's action in step two to define the "allegations and transactions" that must be publicly disclosed in step one. *Jamison*, 649 F.3d at 327.

The information provided in the First Amended Complaint is not "substantially the same" as the CMS claims data provided to Relator. For one, the raw data in the disclosures does not correspond in "scope and breadth" to the information in Relator's complaint. *Little*, 690 F.3d at 293. Nor does the CMS data contain both the misrepresented state of facts and the true state of facts (the X and the Y). Rather, the CMS data merely supplies the allegedly misrepresented state of facts—the claims that were submitted for Medicare reimbursement. And if only one of the elements is public, as is the case here, then Relator may present evidence of the missing element— the true state of facts—such that the information Relator provides is not "substantially the same." *Springfield*, 14 F.3d at 655. Nor could one have produced the substance of the First Amended Complaint, both in its interviews and statistical analyses, by "merely synthesizing the public disclosures' description of the…scheme," *Jamison*, 649 F.3d at 331, because the mere knowledge that there are reimbursement claims against the government does not lend itself "set government investigators on the trail of fraud" without more. *Springfield*, 14 F.3d at 655.

In response, Defendant argues that if an action is "even partially based on a public disclosure," then the bar applies. Docket no. 35 at 22. In support, Defendant cites to *Fried*, which held that "if a *qui tam* action is even partly based upon public allegations or transactions," then the public disclosure rule applies. *United States ex rel. Fried v. West Ind. Sch. Dist.*, 527 F.3d 439, 442 (5th Cir. 2008) (citing *Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447, 451 (5th Cir. 1995)).[11] But in both cases, the previously-disclosed "public allegations or transactions" were public disclosures of the fraud itself. In *Federal Recovery Services*, the basis of the court's holding was that two years prior to the relator's complaint, others made allegations of fraudulent

---

[11] At the August 22 hearing, Defendant's counsel claimed *Fried* says "A disclosure is substantially the same if it's even partially based on a public disclosure." Docket no. 52 at 17. But *Fried* is not as broad; rather, *Fried* limits its bar to publicly disclosed "allegations or transactions." The distinction is critical, as the Court notes below.

reimbursement in two state-court filings. *Fed. Recovery Servs.*, 72 F.3d at 451. And in *Fried*, "the very essence of the allegations made by [the relator] had been publicly disclosed on several occasions." *Fried*, 527 F.3d at 442. Those previous public disclosures included the issuance of a government report detailing the potential for fraud and a public congressional debate on the potential for fraud in which the defendants themselves were specifically named. *Id.*

The same cannot be said here. The previous disclosure of CMS claims data is different in scale and kind from previous allegations of fraud made in court filings (*Federal Recovery Services*) and from previous allegations of fraud made in congressional hearings specifically naming the defendant (*Fried*). In both cases, the previous disclosures went directly to the same fraud the relator at issue was purportedly uncovering in its *qui tam* suit and, as such, those courts found the complaints duplicitous and thus barred by the public disclosure bar. *See Fried*, 527 F.3d at 442. In sum, the public disclosure bar prohibits a relator from re-disclosing fraud that has already been alleged, and Relator here has not done so because the CMS data itself carries with it no allegation or inference of fraud. *See, e.g. United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923, 935 (D.C. Cir. 2017) (finding public disclosure bar not triggered where relator "supplied the missing link between the public information and the alleged fraud" by relying on nonpublic information to interpret publicly-disclosed information); *see also United States v. Omnicare, Inc.*, 903 F.3d 78, 89 (3d Cir. 2018) ("[T]he FCA's public disclosure bar is not triggered when a relator relies upon non-public information to make sense of publicly available information, where the public information—standing alone—could not have reasonably or plausibly supported an inference that the fraud was in fact occurring.").[12]

---

[12] Nor was there disclosure of a fraudulent *transaction*. "To disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e. the conclusion that fraud has been committed." *Springfield*, 14 F.3d at 654. The disclosure of the CMS claims data by

### C.  Original Source Exception

 Even if a relator's complaint is based upon (or substantially similar to) public disclosures, an FCA complaint may nonetheless proceed if the relator is an "original source" of the publicly-disclosed information. *Solomon*, 878 F.3d at 146. An original source is an individual or entity who:

> either (i) prior to a public disclosure…has voluntarily disclosed to the Government the information on which the allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicity disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action….

31 U.S.C. § 3730(e)(4)(B). The Fifth Circuit has explained the rationale behind the bar as well as the original-source exception:

> When the facts showing fraud are veiled, relators who discover them should receive a reward for bringing claims. Even when the facts are publicly disclosed, a relator who is an original source may still bring something of value to the table and thus deserves to benefit. In other cases, the government—for whom the public disclosure bar is not an impediment to suit—either has notice of the wrongdoing or gains nothing from a relator with indirect knowledge of the same facts.

*Colquitt*, 858 F.3d at 373. Indeed, "[w]hen the 'investigation or experience of the relator…translate[s] into some additional compelling fact, or…demonstrate[s] a new and undisclosed relationship between disclosed facts,' the relator may proceed as an original source despite public disclosure." *Id.* at 376 (quoting *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 179 (5th Cir. 2004)). This is because "a relator who brings new evidence of wrongdoing that may already be in the public domain still strengthens the government's case—what more compelling evidence is there than the testimony of a witness providing an insider's account of the misconduct—and thus should be allowed to share in the recovery she helped achieve." *Id.*

---

itself does not reveal any such combination. It is simply raw data which, by itself, does not allow a reader or listener to conclude that fraud has been committed.

Here, even if the Court found Relator's information was "based upon" or "substantially similar" to publicly-disclosed information, Relator would still qualify as an original source because Relator has independent knowledge that materially adds to the public information. Specifically, Relator's independent knowledge arises from its interviews with former employees (which do not "derive from" the CMS data) as well as its compilation and analysis of the CMS data, and such information materially adds to the CMS data because the raw numbers alone do not allow for an inference of fraud. *Grubbs*, 565 F. 3d at 190; *see also Springfield*, 14 F.3d at 655. The data alone presents only the misrepresented facts (Y), and Relator adds the true state of facts (X) such that the inference of fraud (Z) can be drawn. *Id.* Indeed, Relator's "investigation or experience…translate[s] into some additional compelling fact" and "demonstrate[s] a new and undisclosed relationship between disclosed facts." *Colquitt*, 858 F.3d at 376 (citing *Reagan*, 384 F.3d at 179). After all, "[w]hat more compelling evidence is there than the testimony of a witness providing an insider's account of the misconduct[?]"). *Id.*

And finally, Relator has "voluntarily provided" the information in its complaint to the government pursuant to 31 U.S.C. § 3730(e)(4)(B). Defendant argues that Relator cannot have "voluntarily provided" the information because that information, it argues, was already owned by the government and because Relator was already contractually obligated to disclose the results of its research to the public. Docket no. 35 at 25. But Relator was not obligated to disclose the entirety of its First Amended Complaint to CMS, as the complaint contains information—indeed, necessary information—that is not a result of Relator's research with the CMS data. As such, the interviews were under no mandatory disclosure regulation. It cannot be said that the use of any government-provided information in one's research thereafter prevents one who uses that information from bringing *any* FCA suit, even with wholly independent research that "set[s]

government investigators on the trail of fraud." *Springfield*, 14 F.3d at 655. In sum, Relator has knowledge that is independent of and materially adds to the publicly disclosed information, and it has voluntarily provided that information to the Government. 31 U.S.C. § 3730(e)(4)(B).

## III.   <u>Conspiracy and Reverse FCA Claims</u>

Defendant claims that Relator's causes of action for conspiracy (31 U.S.C. § 3729(a)(1)(C)) and reverse FCA (§ 3729(a)(1)(G)) must fail as derivative of its FCA claims. Docket no. 35 at 26. And further, Defendant argues, Relator has not sufficiently alleged a reverse FCA claim because Relator has not alleged that Creative avoided any obligation to pay the government. Relator responds that it extensively alleges false claims with actual knowledge, knowledge which triggers the statutory repayment provision, thus leading to an independent claim under the FCA.

### a.   **Conspiracy under § 3729(a)(1)(C)**

A person who conspires to commit a violation of any subsection of § 3729(a) is liable under § 3729(a)(1)(C). To prove conspiracy under the FCA, Relator must be able to show the existence of an unlawful agreement to violate the FCA and at least one act performed in furtherance of that agreement. *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008). And as part of that showing, Relator must also demonstrate a "specific intent to defraud the government." *Id.* (citing *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 857 (S.D. Tex. 2003). To establish the "meeting of the minds required for specific intent" it is insufficient to show only that the alleged conspirators "intended to engage in the conduct that resulted in the injury." *Reagan*, 274 F. Supp. 2d at 857 (quoting *Peavey v. WFAA-TV, Inc.*, 221 F.3d 158, 173 (5th Cir. 2000). Rather, Relator must show that the parties were "aware of the harm or wrongful conduct [to be committed] at the inception of the combination or

agreement." *Id.* In so pleading, a plaintiff must plead with particularity the conspiracy as well as the overt acts taken in furtherance of the conspiracy. *Grubbs*, 565 F.3d at 193 (citing *FC Inv. Group LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1097 (D.C. Cir. 2008). In *Grubbs*, the Fifth Circuit found that the mere fact that various doctors over a period of years submitted false claims, did not, "by itself, do more than point to the possibility of an agreement among them." *Id.*

Here, Relator argues that its allegations "certainly amount to allegations of *knowledge* that are plausible on their face.'" Docket no. 52 at 20 (citing *Twombly*, 550 U.S. at 570) (emphasis added). But knowledge is insufficient for a conspiracy claim; Relator has pleaded no facts—and does not claim to have done so—showing any specific intent to defraud the Government, much less that such intent arose at the inception of an agreement between Creative, Century, and Reliant. *Reagan*, 274 F. Supp. 2d at 857. Relator does adequately plead that Defendant placed pressure on Century and Reliant to submit false claims, but Relator does not plead that an unlawful agreement arose among those parties. *Farmer*, 523 F.3d at 343; *see also United States ex rel. McLain v. Fluor Enterprises*, No. 6-11229, 2013 WL 3899889 (E.D. La. July 29, 2013) (finding plaintiff inadequately pleaded conspiracy where plaintiff did not provide "any indication that any of the parties actually agreed to enter into the alleged conspiracy"). Accordingly, the Court GRANTS Defendant's motion to dismiss Relator's conspiracy claims under § 3729(a)(1)(C).

### b. Reverse FCA Claim under § 3729(a)(1)(G)

A reverse false claim involves "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceal[ing] or knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). "In a reverse false claims suit, the defendant's action does not result in improper

payment by the government to the defendant, but instead results in no payment to the government when a payment is obligated." *United States ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 653 (5th Cir. 2004).

A reverse FCA claim here, without any additional facts, would be redundant. *See, e.g. United States ex rel. Ligai v. ETS-Lindgren, Inc.*, No. H-112973, 2014 WL 4649885 (S.D. Tex. Sept. 16, 2014) ("This type of redundant false claim is not actionable under subsection [a(1)(G)]."; *see also United States ex rel. Besancon v. Uchicago Argonne, LLC*, No. 12-C-7309, 2014 WL 4783-56, at *4 (N.D. Ill. Sept. 24, 2014) ("[U]nder Relator's theory whenever there is a violation of § 3729(a)(1)(A) for a defendant's receipt of payment of a false claim, there would also be a violation of § (a)(1)(G) for failing to return to the payment. That, of course, would make § a(1)(G) redundant to § 1(a)(1), which is not the intent of the statute.").[13] Relator provides no additional facts and cites to no case to support its contention that any violation of § 3729(a)(1)(A) necessarily carries with it a violation of § 3729(a)(1)(G). Accordingly, Defendant's motion is GRANTED with respect to Relator's reverse FCA claim.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss (docket no. 35) is GRANTED IN PART and DENIED IN PART. Relator's reverse FCA claim under § 3729(a)(1)(G) and conspiracy claim under § 3729(a)(1)(C) are DISMISSED.

It is so ORDERED.

SIGNED this 13th day of November, 2019.

---

[13] *See also United States v. Kinetic Concepts, Inc.*, CV 08-1885, 2017 WL 2713730, at *13 (C.D. Cal. Mar. 6, 2017) ("In cases where a plaintiff alleges a reverse false claim by claiming that the defendant fraudulently overcharged the government and then failed to repay the government, courts have consistently dismissed the claim as redundant of false statement and presentment claims.").

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE